**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KIMBERLY WARNER,<br><br>Plaintiff,<br><br>v.<br><br>DAVITA VANCE-COOKS, *in her official capacity as Acting Public Printer of the United States*,<br><br>Defendant. | Civil Action No. 10-1306 (BAH)<br>Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Kimberly Warner, who is currently employed as the Chief of the Digital Print Center ("DPC"), a unit of the Plant Operations Division of the Government Printing Office ("GPO"),[1] initiated this action against GPO's Chief Executive Officer, in his official capacity, alleging a "pattern of sex discrimination and retaliation" in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. Complaint, ECF No. 1 ("Compl."), ¶ 1.[2] Over the last decade, this plaintiff has had a fraught employment history with GPO, involving her filing five formal Equal Employment Opportunity ("EEO") complaints about multiple decisions made by GPO that the plaintiff alleged reflected discriminatory and retaliatory treatment of her. The wrongful actions alleged by the plaintiff in the instant action arise from three of these EEO complaints and include denial of her applications for more senior management positions, her requests for training opportunities, committee assignments, and a

---

[1] GPO was created by Congress in 1860 "to procure and print materials for Congress and federal departments and agencies." Compl. ¶ 5. "GPO is responsible for collecting, organizing, preserving, printing, and distributing publications for the federal government." *Id.*

[2] Davita Vance-Cooks, the Acting Public Printer of GPO, has been automatically substituted as the named defendant in place of Robert C. Tapella, who was originally named as the defendant, in his official capacity as GPO's Public Printer and Chief Executive Officer. FED. R. CIV. P. 25(d).

private office; the downgrading of two performance evaluations from the highest to second

highest rating; understaffing, the noise level and equipment leasing at DPC; and the reassignment

of three DPC employees, a management decision which the plaintiff views as a removal of

certain of her supervisory functions.   The defendant has moved for summary judgment,

contending that the plaintiff's claims are fatally flawed because, *inter alia*, the alleged wrongful

actions do not constitute adverse employment actions, are untimely, and/or were taken for

legitimate, non-discriminatory or non-retaliatory reasons, which the plaintiff cannot show are

pretextual.   For the reasons explained below, the defendant's pending motion for summary

judgment is granted.

## I.      BACKGROUND

After graduating from high school and working as a cashier and ticket seller for Tour

Mobile Sightseeing, the plaintiff, in 1989, began her employment with GPO, where she initially

worked as a payroll technician in the Finance Department.   Compl. ¶ 6; Def.'s Mot. for Summ.

J., ECF No. 21 ("Def.'s Mot."), Ex. 1 (Deposition of Kimberly Warner (Oct. 17, 2011) ("Pl.'s

Dep."), ECF No. 21-5, at 9;[3] Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF

No. 24, at 2; Pl.'s Opp'n, Ex. 3 (Declaration of Kimberly Warner (Apr. 16, 2012) ("Pl. Decl.")),

ECF No. 24-3, ¶ 2.   Approximately six years after joining GPO, in 1995, the plaintiff began

working as a graphic process operator in the Phototypesetting and Processing Section of GPO.

Pl.'s Resp. to Def.'s Stmt. of Mat. Facts Not in Dispute, ECF No. 24 ("Pl.'s Facts"), ¶ 1; Def.'s

Stmt. of Mat. Facts Not in Dispute, ECF No. 21 ("Def.'s Facts"), ¶ 1; *see also* Compl. ¶ 6.   In

---

[3] The parties have submitted different excerpts from the same depositions as exhibits to both moving and responsive papers and, for ease of review, citations to the depositions will identify the docket number where the referenced deposition section may be found rather than the exhibit number.

2001, she was promoted to Supervisory Graphic Process Operator.[4]  Pl.'s Facts ¶ 9; Def.'s Facts

¶ 9; *see also* Compl. ¶ 6.  The plaintiff has not attended college nor participated in any

apprenticeship program to become a journeyperson in printing.  Pl.'s Dep., ECF No. 21-5, at 18,

23 (plaintiff explained that she sat for the apprenticeship program test on one occasion but "did

not place high enough" for acceptance into the program).

In 2005, the Phototypesetting and Processing Section was renamed the Digital Print

Center ("DPC"), and, in March 2005, the plaintiff became the first Chief of the DPC.  Pl. Decl. ¶

3.  Also in 2005, the DPC was moved from the Electronic Photocomposition Division ("EPD"),

which is now called "Pre-Press," into the Bindery Division of GPO.  Def.'s Mot., Ex. 2

(Deposition of John W. Crawford (Sept. 30, 2011 & Oct. 14, 2011) ("Crawford Dep.")), ECF

No. 21-6, at 21, Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4 ("undisputed.").  DPC is a graphic processor

operation that does pre-press, printing, and finishing work, including, according to the plaintiff,

binding.  Pl.'s Facts ¶ 6; Def.'s Facts ¶ 6.  Unlike other Bindery units, however, DPC employees

do not need to be craft journeypersons.  Pl.'s Facts ¶ 6; Def.'s Facts ¶ 6.  In March or April of

2005, the plaintiff was promoted to the "newly created position of Chief of DPC."  *Compare*

Pl.'s Facts ¶ 11 (indicating that plaintiff had held title of Chief of DPC "since the position was

created on March 9, 2005") *with* Compl. ¶ 6 (indicating that the plaintiff was promoted to this

position in "April 2005") and *with* Def.'s Facts ¶¶ 11-12 (indicating that plaintiff obtained this

title "as part of the settlement," which occurred in March 2007).[5]  In this position, "she is

currently paid at the same rate paid to an Assistant Foreperson."  Def.'s Facts ¶ 11; Pl.'s Facts ¶

11.

---

[4] The plaintiff notes that this position included responsibilities "held by DPC's former Assistant Foreperson."
Compl. ¶ 6.

[5] This factual discrepancy is immaterial to the pending motion.

In her role as Chief of DPC, the plaintiff "supervises skilled subordinate employees performing both blue-collar and white-collar work, ensures that division goals are met, monitors production of GPO materials, troubleshoots any problems in the DPC and two offsite locations, and otherwise oversees the safe operation and maintenance of the DPC." Compl. ¶ 7. The plaintiff "is in charge of scheduling, assigning work to, training, evaluating, and monitoring employees across three shifts and serves as the selecting official for all vacancies within the DPC." *Id.* Her "position requires expert knowledge in highly technical machinery, computers, and software applications; GPO and DPC procedures, work standards, and workflow; and GPO personnel policies, functions, and operations." *Id.*

### A.      2005 Equal Employment Opportunity Complaints and 2007 Settlement

Shortly after becoming Chief of the DPC, the plaintiff filed her first formal EEO complaint with GPO on April 27, 2005, alleging gender discrimination by Robert Schwenk, Directing Manager of Plant Operations, and Dannie Young, Superintendent of the Electronic Processing Division ("EPD"), because "she was being paid less than her male coworkers," Compl. ¶ 8, and "being paid significantly less than the male supervisor she replaced," Pl.'s Opp'n at 2; *see also* Pl. Decl. ¶ 9; Pl.'s Opp'n, Ex. 4 (EEO Complaint of Discrimination No. 05-16, filed April 27, 2005), ECF No. 24-4. Six months after filing her first complaint, the plaintiff filed a second formal EEO complaint on October 18, 2005, alleging that GPO had retaliated against her for filing her first complaint. Compl. ¶ 8. In 2006, the plaintiff's two EEO complaints were consolidated, and in March 2007, the plaintiff reached a settlement with GPO under which the plaintiff "received an increased hourly wage" equivalent to that of an Assistant Foreperson, and "a lump sum payment." *Id.*; Pl.'s Opp'n, Ex. 5 (EEOC Settlement Agreement, *Warner v. James*, EEOC No. 100-2005-00191X (Mar. 12, 2007)), at 2-5; Pl. Decl. ¶ 9.

According to the plaintiff, management personnel supervising her during the key period at issue in the instant complaint "were all aware of this protected activity," including Walter Wingo, who was her immediate supervisor as of early 2008, Katherine Taylor, who was her second-level supervisor, and John Crawford, who was her fourth-level supervisor.[6]  Pl.'s Opp'n at 2; *see also* Pl.'s Opp'n, Ex. 6 (Deposition of John W. Crawford (Sept. 30, 2011 & Oct. 14, 2011) ("Crawford Dep.")), ECF No. 24-6, at 332-33; Pl.'s Opp'n, Ex. 7 (Deposition of Katherine L. Taylor (May 3, 2011) ("Taylor Dep.")), ECF No. 24-7, at 267; Pl.'s Opp'n, Ex. 8 (Deposition of Walter H. Wingo, Jr. (Aug. 3, 2011) ("Wingo Dep.")), ECF No. 24-8, at 250-51.

### B.  Allegations of "Obstacles to Advancement" Following the 2007 Settlement

The plaintiff alleges that she faced "obstacles to her professional advancement" after the settlement of her EEO complaints in 2007.  Compl. ¶ 1.  These alleged obstacles take myriad forms, including allegedly lower-than-deserved performance evaluations in 2007 and 2008, non-selection for promotion, poor working conditions, denial of professional opportunities, and reduction in supervisory responsibilities.  The plaintiff's criticisms of multiple management decisions and activity from 2007 through 2010 could devolve into analysis of workplace minutia but are only generally described below with the key facts underlying her claims of gender discrimination and retaliation.

---

[6] The plaintiff, as discussed *infra*, accuses a number of her supervisors of participating in discriminatory or retaliatory actions.  For reference, at the time of the settlement of her EEO complaints in March 2007, the plaintiff's "supervisory chain of command . . . consisted of John Crawford, Assistant Superintendent of Binding, as her first level supervisor, Katherine Taylor, Superintendent of Bindery, as her second-level supervisor, and Marvin Verter, Assistant Production Manager, as her third level supervisor."  Compl. ¶ 9.  "In early 2008, Walter Wingo replaced Mr. Crawford as Assistant Superintendent of Binding and [the plaintiff's] first level supervisor, and Mr. Crawford became the Production Manager and [the plaintiff's] fourth level supervisor.  Since [the plaintiff] filed the formal EEO complaints at issue here, Shelley Welcher has replaced Mr. Verter as Assistant Production Manager."  *Id.*

### 1.    2007 Performance Evaluation

In the fourth quarter ("Q4") of 2007, GPO implemented a bonus program for supervisors, including the plaintiff, and, in connection with that program, performance ratings were issued with respect to that single quarter.  Pl.'s Facts ¶ 16; Def.'s Facts ¶ 16.  On January 7, 2008, Ms. Taylor, who had become the Superintendent of the Bindery and the plaintiff's second-level supervisor in December 2007, shortly before the ratings were given, showed the plaintiff her performance rating for Q4 2007.  Pl.'s Facts ¶¶ 14, 17; Def.'s Facts ¶¶ 14, 17.  The plaintiff points out that this was "her first evaluation since the March 2007 settlement."  Compl. ¶ 16.  This was also the first time that monetary awards were tied to performance ratings, and "achieving 'outstanding' was a little more difficult because goals had to be met to get the money."  Def.'s Mot., Ex. 4, Affidavit of John Crawford (Mar. 13, 2009) ("Crawford Aff."), ECF No. 21-4, ¶ 5; *see also* Crawford Dep., ECF No. 21-6, at 58.[7]

The plaintiff received an "excellent" rating, one rating below the highest rating of "outstanding," which she had "consistently received" before then.  Compl. ¶ 16; Pl.'s Facts ¶ 18; Def.'s Facts ¶ 18.  Although the plaintiff immediately disputed the rating, she nevertheless signed it at the direction of Ms. Taylor, who indicated that without the plaintiff's signature, she would not obtain her bonus.  Pl.'s Facts ¶ 17.  The plaintiff says that she signed the document to "acknowledge[] seeing the evaluation, not that she agreed with it."  *Id.*[8]  The plaintiff tried to discuss her evaluation with her fourth-level supervisor, John Crawford, who was Ms. Taylor's predecessor as the Bindery Superintendent until he became the Production Manager in charge of

---

[7] In 2006, the plaintiff had received an "outstanding" rating, when Mr. Allegar and Mr. Crawford were her first and second-level reviewers, respectively.  Pl.'s Dep., ECF No. 21-5, at 77.

[8] The "employee copy" of the 2007 evaluation reflects that the plaintiff signed it on "11/7/08," but she confirmed at her deposition that that was an error and that the actual date of her signature was "1/7/08," as reflected on both the "supervisor copy" and "employment copy" of the same evaluation that she signed at the same time.  Pl.'s Dep., ECF No. 21-5, at 58, 60; Def.'s Mot., ECF No. 21-8, Ex. 8 (Employee Performance Evaluations).

the Bindery and five other divisions.  *Id.*; Def.'s Facts ¶ 13; Crawford Dep., ECF No. 21-6, at 16-17 (as Production Manager, Mr. Crawford supervises "approximately a thousand people," in six divisions, including "press, pre-press, plant planning, binding, production[,] engineering").[9]  Mr. Crawford, however, refused to discuss the evaluation with the plaintiff.  Pl.'s Facts ¶ 17.

According to the plaintiff, she only received a copy of the evaluation form in March 2008, after it was processed by GPO's Human Capital unit.  *Id.*  The plaintiff alleges that the form contained "irregularities," because erasure marks indicated that her scores had been lowered.  Pl.'s Opp'n at 4-5.  While the plaintiff received checkmarks in the boxes for a "fully satisfied" rating for eight of nine listed Job Elements and in the box for an "outstanding" rating for the ninth, she alleges that the boxes for "outstanding" on five of the Job Elements had been checked, erased, and changed to "fully satisfied."  Pl.'s Opp'n at 4; Pl.'s Dep., ECF No. 24-1, at 62; Crawford Dep., ECF No. 24-6, at 352-53; Compl. ¶ 16.  In addition, in the "Summary Rating" section of the form, she received an "excellent" rating, but she alleges that the box for an "outstanding" rating had been checked, erased and changed to "excellent."  *Id.*

Another "irregularity" of the 2007 evaluation, according to the plaintiff, was that it was signed by Robert Allegar, based on "materials that [the plaintiff] submitted to show that she had met each Job Element."  Pl.'s Opp'n. at 5.  The plaintiff claims, however, that Mr. Allegar "had worked outside the building for the previous year and had not supervised [the plaintiff] during that time."  Compl. ¶ 16; *see also* Pl.'s Opp'n at 5.  The ratings were also reviewed by Mr. Crawford, who could not recall specifically why the plaintiff was rated "fully successful" rather than "outstanding" for eight Job Elements, but understood that the plaintiff had not met some metrics under her goals.  Pl.'s Opp'n at 5; Crawford Dep., ECF No. 24-6, at 94; Crawford Aff.,

---

[9] Mr. Crawford was Superintendent of the Bindery from 1994 to November 2007, when he became the Production Manager, replacing Jeff Bernazzoli.  Def.'s Facts ¶ 13.

ECF No. 21-4, ¶ 5 ("[S]he had some metrics but they were not what the goal said.").  Mr.

Crawford explained that "[n]obody in Bindery received an 'outstanding' rating," not even

himself.  Crawford Aff., ECF No. 21-4, ¶ 5.

The plaintiff alleges that "[e]ach rating translated to a number of points, which were used

to calculate [the plaintiff's] performance bonus."  Pl.'s Opp'n at 4; *see also* Pl.'s Opp'n, Ex. 13

(Supp. GPO Form 2970: Performance-Based Award Point Calc. Sheet for Kimberly Warner for

Oct./Nov. 2007); Pl. Decl. ¶ 28.  The plaintiff was paid a bonus for fiscal year 2007 for the

"excellent" rating she received.  Declaration of Stephanie F. Smith ("Smith Decl.") (June 29,

2012) (filed under seal), ECF No. 29, ¶ 3.  If the plaintiff had received the "outstanding" rating

that she says she deserved, her bonus would have been increased by *at most* $217.50.  *Id.*

### 2.       2008 Non-selection for Position

The plaintiff alleges that, after her 2007 EEO settlement with GPO, she has applied for

seven positions within GPO at the "PG-13" and "PG-14" pay grades.[10]  Compl. ¶ 13.  For each

of the positions, including Passport Manager, In-Print Printing Service Specialist, and Assistant

to the Production Manager, the plaintiff "was placed on the Best Qualified List . . . but was only

interviewed for one and was not selected for any of the positions."  *Id.*  Instead, she alleges that

men "were selected for all but one of the positions."  *Id.*  The only non-selection expressly

contested in her claims, however, is that for the position of Assistant to the Production Manager.

*See* Compl. ¶¶ 31, 35.  Thus, this is the only unsuccessful application process specifically at

issue in this lawsuit.  *See* Pl.'s Opp'n at 4 ("At issue here is Ms. Warner's February 2008

application to be Assistant to the Production Manager.").  Consequently, description of the

---

[10] The plaintiff indicates in her Opposition that she "has applied for thirteen jobs in GPO's management."  Pl.'s
Opp'n at 3 (citing Pl. Decl. ¶¶ 22, 23, 25).  The discrepancy is not material for purposes of deciding this motion.

application and selection process for this position is necessary to evaluate this aspect of the plaintiff's claims.

In February 2008, a vacancy for an Assistant Production Manager position (second shift) was announced under vacancy announcement 08-480, Pl.'s Facts ¶ 26; Def.'s Facts ¶ 26, and the plaintiff applied for it, Compl. ¶ 14.  The major responsibilities of this posted position included: (1) "direct[ing] all shift 2 functions necessary to accomplish pre-press, press and post-press work;" (2) "manag[ing] production activities within the various Production Department divisions to ensure that production deadlines are met and commitments fulfilled, and that optimum quality of products and efficiency of operations are maintained;" (3) "start up the Federal Register, to ensure that it's out of pre-press and into plate and press;" and (4) putting out the Congressional Record, which is "equivalent to putting out a newspaper every day."  Pl.'s Facts ¶¶ 27-28; Def.'s Facts ¶¶ 27-28.

The plaintiff was among three individuals listed as eligible for consideration for the vacant position.  Pl.'s Facts ¶ 29; Def.'s Facts ¶ 29.  From this list, Mr. Crawford, who was the selecting official, selected Richard Lewis.  *Id.*  The plaintiff concedes that Mr. Lewis had 37 years of experience in the printing trade and, further, does not dispute that he had a broad range of experience in the operations of GPO, including work in positions involved in the processing of the Congressional Record and Federal Register as well as directly with pre-press and press, and otherwise had been exposed to various manufacturing requirements and every kind of job that comes through the Production department.  Pl.'s Facts ¶ 30; Def.'s Facts ¶ 30.  She contends that she had "comparable qualifications" to Mr. Lewis, however, and that "Mr. Crawford's justification for hiring Richard Lewis" was not based upon his belief that Mr. Lewis was best

qualified but instead was motivated by retaliatory and discriminatory motives against the plaintiff.  Pl.'s Facts ¶¶ 30, 32.

The plaintiff further contends that she should have been given the opportunity to fill temporarily the Assistant Production Manager position, just as Mr. Lewis was given this opportunity for three months, allowing him to "gain[ ] valuable experience," before he was promoted to the position.  Pl.'s Facts ¶ 32; Compl. ¶ 14.

Following her non-selection for the Assistant Production Manager position, the plaintiff filed an informal EEO complaint, on April 9, 2008, alleging gender and race discrimination, and retaliation for past EEO activity on the basis of, *inter alia,* the defendant "fail[ing] to promote [the plaintiff] to the Assistant to the Production manager position and . . . lowering . . . her 2007 performance evaluation."  Compl. ¶ 23.  Since there was no resolution of her informal complaint, the plaintiff filed, three months later on July 3, 2008, her third formal EEO complaint.  *Id.*

### 3.    Complaints About Working Conditions

The plaintiff complains about multiple aspects of her physical working conditions, contending that these working conditions were retaliatory and discriminatory.  She predicates this contention, at least in part, on a comment allegedly made in November 2007 by Mr. Crawford, who was then the Production Manager in charge of the Bindery and other GPO divisions and was aware of the plaintiff's earlier EEO settlement.[11]  The plaintiff was not present at the meeting when the alleged comment was made but understands from another person that Mr. Crawford indicated "that he was going to make things difficult" for her and that he was planning "to let the dogs out" on the plaintiff.  Compl. ¶ 18; *see also* Pl.'s Dep., ECF No. 21-5, at 38-39 (plaintiff testifying that Mr. Young, who attended the meeting at which Mr. Crawford

---

[11] The Complaint describes this alleged statement by Mr. Crawford under the section titled "Changes in Working Conditions," *see* Compl. ¶¶ 18-29, and does not reference it in connection with her allegations regarding her non-selection or her 2008 performance evaluations.

allegedly made this statement, repeated the statement to plaintiff in a telephone call, but she took no notes of the comment).  Mr. Crawford denies ever having made such a comment, stating "I don't use terms like that," and further testified that he first learned of this allegation during his deposition.  Crawford Dep., ECF No. 21-6, at 331.

### i.      Workplace Noise and Other Inconveniences Absent a Private Office

The plaintiff alleges that, in 2007, "excessively loud non-DPC machinery was put into the DPC."  Compl. ¶ 19.  According to the plaintiff, the non-DPC machinery "is so loud that a safety inspector concluded that the noise level in the DPC is unsafe and advised [the plaintiff] and her employees [to] wear ear plugs."  *Id*.  The plaintiff alleges, however, that "given the nature of DPC's business, which includes consulting with customers and vendors over the telephone and servicing walk-up customers, wearing ear plugs is often not feasible" and that "[n]o other actions have been taken to remedy the problem."  *Id*.[12]

Related to the noise issue, the plaintiff alleges that she has been deprived an office and that, consequently, she "faces unnecessary obstacles to performing [her work] tasks because she does not have a private work space."  Compl. ¶ 20.  The plaintiff complains that while her work space is situated "in the middle of the DPC [work] area," "[a]ll Forepersons, Assistant Forepersons, and Group Chiefs in the Bindery Division have offices."  *Id*.  She alleges that she "has been promised an office on several occasions but has never received one."  *Id*.

Mr. Crawford indicates that he agrees with the plaintiff about having her own office, but that space for Bindery personnel has been used by others, noting that space "planned for the

---

[12] Although it is not entirely clear from the record whether Mr. Crawford is referring to the same noisy equipment complained about by the plaintiff, Mr. Crawford stated that he did not want certain equipment put in the DPC but his objection was overruled by another GPO official.  Crawford Aff., ECF No. 21-4, ¶ 9 ("I didn't think that equipment should be there either, but we didn't control those decisions[.  ]Schwenk did."); *id*. ¶ 10 ("I had no say on that equipment coming in either.").

offices" was used for equipment and a "Bail-Out Commission."  Crawford Aff., ECF No. 21-4, ¶ 9; *id.* ¶ 10 ("I do still think Kim should have her own space . . . . We had been told that some other things have priority.").

Notwithstanding her workplace conditions, the plaintiff has been able to perform her duties at an "excellent" and "exceeds expectations" level, although she contends that she is hampered in being able to perform "at peak efficiency."  Pl.'s Facts ¶ 39; Def.'s Facts ¶ 39.  She does not appear to dispute that her work area contains a desk, computer, and a file cabinet, with additional access to a locked cage for storage of sensitive files and to conference rooms for private meetings and telephone calls.  Def.'s Facts ¶ 39; Pl.'s Facts ¶ 39.  Nevertheless, the plaintiff complains that since her "computer is visible to anyone walking near her," she is unable to work on confidential matters on her computer when other employees are present, and that she has to find meeting space in other offices or rooms, including "on multiple floors."  Pl.'s Facts ¶ 39.

### ii.    Understaffing of DPC

The plaintiff alleges that "DPC is not adequately staffed, resulting in [the plaintiff] and her staff being overworked, unable to take time off, and under intense pressure."  Compl. ¶ 21.  As a result of the understaffing, the plaintiff alleges that she "has had to step in to do printing work that would otherwise be done by her subordinate employees, making it difficult for her to complete her supervisory duties."  *Id*.  To remedy the understaffing, the plaintiff "has been trying to fill vacancies in the DPC since 2006," *id*., and, in fact, in 2007, filled one of 5 approved positions for Océ operator vacancies.  *Id*.  The defendant points out that the plaintiff had the opportunity to fill all of the Océ operator positions in 2007, "but chose not to make a selection from the certificate of eligibles issued" for these vacancies, except for one.  Def.'s Facts ¶ 40.

The plaintiff explains that "there were not enough qualified individuals," and that the remaining four vacancies were cancelled in May 2008 before she could fill them.  *See* Pl.'s Facts ¶¶ 40-41. According to Ms. Taylor, during the 2009 fiscal year budget process "headcount was being reduced across the board," and she "could not make a business case to keep the [Océ] operator vacancies in the budget when the DPC had operated for a period of time without those vacancies being filled[.]"  Def.'s Facts ¶ 41; Def.'s Mot., Ex. 2 (Aff. of Katherine Taylor) ("Taylor Aff.") ¶ 9.  Consequently, "the vacancies were cancelled."  *Id.*  The plaintiff discounts this business-related justification for the cancellation of the vacancies and posits instead that "Ms. Taylor's cancellation of the vacancies was motivated by retaliation and discrimination."  Pl.'s Facts ¶ 41.

The plaintiff filed an informal EEO complaint on July 9, 2008, "alleging discrimination based on sex and race[,] and retaliation for her participation in the EEO complaint process, including removing the functions that control [the plaintiff's] pay grade level and the failure to adequately staff DPC."  Compl. ¶ 25.  Since there was no resolution of her informal complaint, the plaintiff filed her fourth formal EEO complaint on August 21, 2008.  *Id.*

The plaintiff concedes that she was able to hire three graphic process operators in the 2009-2010 time period because a need was identified for those positions.  Pl.'s Facts ¶ 42; Def.'s Facts ¶ 42; Pl.'s Dep., ECF No. 21-5, at 213-16.

### 4.   2008 Performance Evaluation

The plaintiff's "Summary Rating" in her performance evaluation for 2008 was "exceeds expectation," which is the second highest available rating under "Outstanding," based upon a score of 67 out of 75 on the individual goals in her performance plan for that review period. Def.'s Facts ¶ 21; Compl. ¶ 17; Def.'s Mot., Ex. 12 (Summary Rating Form), ECF No. 21-8.

The plaintiff contends that these scores are "inappropriate and undeserved," Pl.'s Facts ¶ 21, and disputes the justification given by her immediate supervisor, Walter Wingo, for the ratings.

At a meeting in February 2009, Mr. Wingo explained that the plaintiff received an "exceeds expectations" rating because she failed to meet three goals in her performance plan for the 2008 time period.  Def.'s Facts ¶ 22; Wingo Dep., ECF No. 24-8, at 62, 76.  This performance plan required, *inter alia*, that the plaintiff (1) ensure that 7B cards, which a supervisor uses to track an employee's disciplinary history, were up-to-date and that corrective actions were timely; (2) "[d]evelop and maintain records by operator of percent time spent on printer operation and job handling; hand-finishing, Digipath utilization;" and (3) "develop a job description proposal by August 30, 2008 for a 'Graphic Processor Operator Pre-flight Specialist.'"  Def.'s Facts ¶ 22; Def.'s Mot., Ex. 11 (GPO Supervisory Performance Agreement for Kimberly Warner, dated Mar. 24 & 25, 2008) ("GPO Supervisory Performance Agreement"), ECF No. 21-8, at 5, 7, 9; Pl.'s Dep., ECF No. 21-5, at 85-86; Taylor Dep., ECF No. 21-7, at 49.

With respect to the first goal, Mr. Wingo said that the plaintiff failed to ensure that the 7B cards of one of her subordinate supervisors were up-to-date and that corrective actions were timely.  Def.'s Facts ¶ 23; Taylor Dep., ECF No. 21-7, at 48-50; Pl.'s Dep., ECF No. 21-5, at 96-98.  The plaintiff does not appear to dispute the fact that the required documentation was incomplete for a DPC employee, but rather disagrees about whether she should be held responsible for the lapse. The plaintiff contends that she "was not responsible for the 7B cards of employees directly supervised by her subordinate supervisors," but only for those employees "she directly supervised."  Pl.'s Facts ¶ 23.

With respect to the second goal, Mr. Wingo informed the plaintiff that she did not include records reporting the "percent time" operators spent on "printer operation and job handling;

hand-finishing; [and] Digipath utilization" in her evaluation binder.  Def.'s Facts ¶ 24; Taylor

Dep., ECF No. 21-7, at 53-55; Pl.'s Dep., ECF No. 21-5, at 88-89.  The plaintiff asserts that

"[t]his was not true," and states that she had reported the operators' time on a log sheet in terms

of the numbers of hours worked.  Pl.'s Opp'n at 7; Pl. Decl. ¶ 38.  The plaintiff concedes that her

performance plan plainly required reporting the number of hours as a percentage of time worked

on each particular task but contends that any failure to report the hours as dictated by the

performance plan had previously been excused by Ms. Taylor.  Pl.'s Dep., ECF No. 24-1, 87:13-

88:5; Pl. Decl. 38; Pl.'s Opp'n at 7 (Ms. Taylor "had told Ms. Warner that reporting hours

without a percentage was acceptable."); Pl.'s Facts ¶ 24 (plaintiff maintained the records "in

hours, per Ms. Taylor's instructions").

Finally, with respect to the third goal, Mr. Wingo told the plaintiff that "she did not

submit written standards and ratings for Graphic Processor Operators and a job description

proposal for Graphic Processor Operator, Pre-flight Specialist" by the August 30, 2008 deadline

set out in the performance plan.  Pl.'s Opp'n at 7; Pl. Decl. ¶ 39.  The plaintiff does not dispute

that she failed to hand-over to any supervisor a copy of the job description by the deadline of

August 30, 2008, but takes the position that the "performance plan did not require her to do so"

and her supervisors never asked for it.  Pl.'s Facts ¶ 25.  According to Mr. Wingo, the position

description should have been turned over to him by the deadline stated in the performance plan,

and he told the plaintiff that.  Wingo Dep., ECF No. 24-8, at 78.  She contends that she fulfilled

this performance plan goal because she had completed the job description by the deadline and

had included this undated document "in the binder that she submitted to document her 2008

performance."  Def.'s Facts ¶ 25.

The plaintiff was paid a bonus for fiscal year 2008 for the "exceeds expectations" rating she received.  Smith Decl., ECF No. 29, at ¶ 4.  If the plaintiff had received an "outstanding" rating, as she says she deserved, her bonus would have been increased by between $129 and $345.00.  *Id.*  The plaintiff attempted to appeal her evaluation through the Human Capital department, but Mr. Wingo would not change her ratings.  Pl.'s Opp'n at 8; Pl. Decl. ¶ 41.

The plaintiff filed an informal EEO complaint on March 24, 2009, "alleging discrimination on the basis of retaliation for participation in the EEO complaint process, including arbitrarily lowering scores on her 2008 performance appraisal."  Compl. ¶ 28.  Since there was no resolution of the informal complaint, the plaintiff filed her fifth formal EEO complaint on April 30, 2009.  *Id.*

### 5.    Denial of Professional Opportunities

Since her 2007 EEO settlement, the plaintiff claims that she has been denied various professional opportunities, alleging in her Complaint that at unspecified times she was not allowed to "cross-train—that is, to train to do work in another GPO division—and to participate in special projects, although similar opportunities are given to male employees."  *Id.* ¶ 15.  More specifically, the plaintiff alleges that "[f]or over two years, [her] requests to cross-train in the Binding Division have been denied," while "Darrell Mahoney, a Foreperson in the Binding Division, has been given the opportunity to observe and learn about [the plaintiff's] position."  *Id.*

The plaintiff also cites two examples of "special projects" for which she has been denied the opportunity to participate.  First, she alleges that her request at some unspecified time for a detail proposed by "the Superintendent of Planning, Scheduling, and Estimating," "was denied by [the plaintiff's] supervisors."  *Id.*  Second, she cites the denial of her request to "to join a new

Safety Committee, spearheaded by Mr. Mahoney," even though one of her own subordinates was solicited to participate.  *Id.*  With respect to the Safety Committee, the plaintiff does not dispute that this committee was created in approximately 2008 to give non-supervisory employees the opportunity to assess the safety of their own work areas and, consistent with its focus on non-supervisory employee involvement, that Mr. Mahoney was the only supervisor on the Committee after his name was proposed "by an employee of the safety office."  Def.'s Facts ¶¶ 33, 34, 35; Taylor Dep., ECF No. 21-7, at 152-57; Pl.'s Facts ¶¶ 33, 34, 35.

### 6.     Changes in Supervisory Responsibilities

The plaintiff complains that certain personnel or equipment changes amount to a "stripp[ing] of supervisory duties" motivated by gender discrimination and retaliation.  Compl. ¶¶ 31, 35.  According to the plaintiff, she "is left out of meetings where important decisions are made," even though Forepersons and Assistant Forepersons are invited to these meetings.  *Id.* ¶ 22.  In response to this complaint, Ms. Taylor, "has claimed that she forgot to invite [the plaintiff]."  *Id.*  The plaintiff concedes that she voluntarily stopped attending certain meetings due to an incident of verbal abuse from a manager, Marvin Verter.  *Id.* ¶ 27.  Specifically, the plaintiff alleges that "[i]n December 2008, a verbal tirade from Mr. Verter caused [the plaintiff] to suffer an anxiety attack that sent [her] to the medical station where she spent the afternoon receiving oxygen."  *Id.*; *see also* Pl.'s Dep., ECF No. 24-1, 169:1–170:10; Pl. Decl. ¶ 58.  After this incident, the plaintiff says she did not feel comfortable attending Mr. Verter's weekly production meeting, so she sent a representative from the DPC to attend in her place.  Pl.'s Opp'n at 11; Pl. Decl. ¶ 58.  Ms. Taylor then informed the plaintiff that no one from DPC was needed at the weekly meeting, "leaving the DPC excluded from these meetings altogether."  Pl.'s Opp'n at 11; Pl. Decl. ¶ 58.  The plaintiff alleges that Mr. Crawford, who is Mr. Verter's direct

supervisor, has "ignored" her requests to meet about the situation with Mr. Verter.  Compl. ¶ 27.

Mr. Crawford apparently disputes this characterization of his handling of the situation,

explaining that he "talked to Marvin about his tone . . . he addresses everyone no matter what sex

or race the same."  Crawford Aff. ¶ 8.  "I have told him to work on it, as some can perceive it in

a different way.  He is just straightforward."  *Id.*

In further support of her claims of having decreased supervisory duties, the plaintiff cites

three examples of "[d]ecisions affecting the DPC" for which she was excluded from meetings:

(1) "what equipment to put in the DPC;" (2) "the decision to close DPC operations in Laurel,

Maryland;" and (3)  the transfer of an employee to another GPO unit.  Compl. ¶ 22.  Not only is

the plaintiff critical of the decision-making process, in which she claims to have been excluded,

but she also plainly disagrees with the decisions themselves, even though she does not dispute

the context in which these decisions were made: namely, that "DPC was running at a significant

financial loss and Ms. Taylor tried to find ways to reduce those losses."  Def.'s Facts ¶ 43; Pl.'s

Facts ¶ 43 (undisputed).

Regarding the decision about DPC equipment, apparently this reflects the plaintiff's

disagreement with management's decision to allow the lease for an electric static color tone

printer, called the iGen3, which was located in the DPC, to expire in 2010.  Def.'s Facts ¶ 51;

Pl.'s Facts ¶ 51 (undisputed).  The plaintiff disputes that allowing this lease to expire was a cost-

saving measure, contrary to the outcome of a management analysis regarding the amount of

product generated from the machine.  Pl.'s Facts ¶ 52; Def.'s Facts ¶ 52; Taylor Dep., ECF No.

21-7, at 203-04; Pl.'s Dep., ECF No. 21-5, at 130-31.  Instead, the plaintiff contends that the

decision was "motivated by retaliation and discrimination."  Pl.'s Facts ¶ 52.

With respect to the closing of DPC's Laurel, Maryland operations, the plaintiff's complaint appears to relate principally to the reassignment of two employees who were, and remain under, her supervision and whose job is to operate the Océ machines, which are located in both GPO's Laurel facility and its main facility.  Pl.'s Facts ¶ 38; Def.'s Facts ¶ 38.  For safety reasons, two operators are required to run the machine, and, consequently, "the machine in Laurel could not be operated if one of the employees was not able to come to work."  Pl.'s Facts ¶ 37; Def.'s Facts ¶ 37.

The plaintiff contends that reassigning the employees from Laurel "caused a backlog in the work that can only be done on the Océ machine," and disputes that the reassignment was made by Ms. Taylor to improve efficiency, even though she does not contest that additional operators were present at the main facility to ensure that the requisite two operators were available for work to be accomplished during their shift.  Pl.'s Facts ¶ 36; Def.'s Facts ¶ 36. Rather, the plaintiff points to the timing of the reassignment of the two employees and closure of the Laurel facility "[i]n July 2008, about three months after [the plaintiff] filed the informal EEO complaint and about the same time she filed the formal complaint," Compl. ¶ 24, to contend that these actions were due to retaliatory and discriminatory motivation.  Pl.'s Facts ¶ 36.

Finally, and related to the plaintiff's complaint about her supervisory duties being "decreased," she alleges that in August 2008, "around the time that [she] filed her second [sic-fourth] formal [EEO] complaint," she learned that one of her employees was being transferred to another GPO unit.  Compl. ¶ 26.  Specifically, Ms. Taylor and other GPO managers decided it was more cost-effective to re-categorize one of the plaintiff's employees, William Middlebrooks, who was working in the Senate Documents Room, as a detail so that GPO could pass on to the Senate a greater share of the cost of his work.  *Id.*; Def.'s Facts ¶ 44; Taylor Dep., ECF No. 21-7,

at 73; Def.'s Mot., Ex. 10, ECF No. 21-8 (E-mail chain between Ms. Warner and Ms. Taylor Regarding Re-categorizing Mr. Middlebrooks as a Detail (Aug. 13, 2008) ("Senate Detail E-mail Chain")).  The plaintiff was consulted as part of the team that negotiated how to handle the detail arrangement, when another unit of GPO, the Congressional Publishing Services ("CPS"), insisted that the detailed employee be placed within that unit − consistent with the management of all other congressional details − and resulted in the plaintiff losing an individual from her "head count[.]"  Def.'s Facts ¶ 47; *see id*. ¶¶ 46-50; Pl.'s Facts ¶¶ 46-50; Taylor Aff. ¶ 7.  The plaintiff "did voice her concerns to Ms. Taylor" about reassigning the employee "out of DPC," Pl.'s Facts ¶¶ 49-50, and Ms. Taylor agreed "and tried to argue that position to CPS," Pl.'s Facts ¶ 48; Def.'s Facts ¶ 48, but without success.  Pl.'s Facts ¶ 50; Def.'s Facts ¶ 50; Senate Detail E-mail Chain.  Ms. Taylor, along with management, determined that "the best thing for GPO overall . . . was to detail the employee through CPS rather than continue running at a loss."  Def.'s Facts ¶ 49.  The plaintiff disputes this reason for the detail, alleging instead that it was motivated by retaliation and discrimination.  Pl.'s Facts ¶ 49.

### C.     Resolution of EEO Complaints and the Instant Lawsuit

A final agency decision was reached on May 11, 2010 for the third and fourth formal consolidated EEO complaints filed on July 3, 2008 and August 21, 2008, respectively.  Compl. ¶ 29.  The agency found that GPO had not discriminated or retaliated against the plaintiff.  *Id.*  More than 180 days had passed since the plaintiff filed her fifth formal complaint on April 30, 2009, without a final agency decision.  *Id.* ¶ 28.

The plaintiff filed this lawsuit on August 4, 2010, within three months of her receipt of the final agency decision on the third and fourth formal consolidated complaints.  She asserts two claims: first, she alleges sex discrimination under Title VII because (1) she "applied for, was

qualified for, and was rejected for several positions within GPO, including the Assistant

Production Manager position[;]" (2) she was denied an office and (3) training opportunities; (4)

given a downgraded 2007 performance evaluation; and (5) stripped of supervisory duties.

Compl. ¶¶ 30-31.  Second, the plaintiff claims that she faced "retaliatory discrimination" in

violation of Title VII in all five of those instances, as well as (6) in her 2008 performance

appraisal.  *Id*. ¶¶ 34-35.  As a result of this alleged discrimination and retaliation, the plaintiff

seeks, *inter alia*, "back pay, reinstatement of leave, compensatory damages, and an injunction

ordering that she be promoted to a position at the PG-14 pay scale."  Compl. ¶ 2; *id*. at 11-12, ¶¶

A-G.

Following a lengthy period of almost two years for discovery, the defendant moved for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[13]  *See* ECF No.

21.  This motion is now pending before the Court.

## II.   STANDARD OF REVIEW

### A.   Summary Judgment

Granting a motion for summary judgment is appropriate if the movant carries the burden

of showing "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other

factual materials in the record.  FED. R. CIV. P. 56(a), (c); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C.

Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The Court is only required to

consider the materials explicitly cited by the parties, but may, on its own accord, consider "other

materials in the record."  FED. R. CIV. P. 56(c)(3).

---

[13] The Scheduling Order, dated November 23, 2010, initially set discovery to close on May 23, 2011, but due to joint requests for extensions, the period for discovery was extended until October 31, 2011.  *See* Minute Orders granting joint requests for extensions, dated February 25, 2011, March 9, 2011, May 18, 2011, and September 12, 2011.

When, at the summary judgment stage, the parties present a genuine dispute about the facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is some metaphysical doubt as to the material facts," *Scott*, 550 U.S. at 380, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

Rather, the nonmoving party must present specific facts "'such that a reasonable jury could return a verdict for the nonmoving party.'"  *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* FED. R. CIV. P. 56(c)(1).  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

### B.    Sex Discrimination

Title VII of the Civil Rights Act "makes it unlawful for federal employers to discriminate on the basis of . . . gender" and to retaliate "when an employee has opposed any practice made an unlawful employment practice." *Grosdidier*, 709 F.3d at 23 (internal quotation marks and citations omitted).  The "two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . sex . . . ." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  With respect to the first element, an adverse employment action for a discrimination claim generally entails a "significant change in employment status," *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003), or "tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities[,]" *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003).  The second element of causation requires a showing "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523 (2013).

"Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973),

to analyze the claim." *Jackson v. Gonzales,* 496 F.3d 703, 706 (D.C. Cir. 2007) (quoting

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  "Although intermediate evidentiary

burdens shift back and forth under this framework, the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff." *Id.* (internal quotation marks and alteration omitted).  Where an employer "has

asserted legitimate, non-discriminatory reason[s] for" the actions being challenged, "the district

court need not— *and should not*—decide whether the plaintiff actually made out a prima facie

case under *McDonnell Douglas.*"  *Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d

490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, the Circuit has instructed that "the

district court must resolve one central question: Has the employee produced sufficient evidence

for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the

actual reason and that the employer intentionally discriminated against the employee on the basis

of . . . sex . . . ?"  *Id.*; *see also Bright v. Copps*, 828 F. Supp. 2d 130, 142 (D.D.C. 2011); *Diggs v.

Potter*, 700 F. Supp. 2d 20, 40 (D.D.C. 2010) (quoting *Brady*, 520 F.3d at 494).

     In resolving that "central question" regarding "the legitimacy of the proffered reason and

the ultimate question of discrimination, the court looks to '(1) the plaintiff's *prima facie* case; (2)

any evidence the plaintiff presents to attack the employer's proffered explanation for its actions;

and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any

contrary evidence that may be available to the employer . . . .'"  *Grosdidier*, 709 F.3d at 25

(emphasis in original) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)

(en banc)); *see also Holcomb*, 433 F.3d at 897.  While the plaintiff need not "submit evidence

over and above rebutting the employer's stated explanation in order to avoid summary

judgment," *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks and citations omitted), the plaintiff must do more than merely state a disagreement with, or disbelief of, the explanation to satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.

C.    **Retaliation**

The legal framework for demonstrating retaliation under Title VII is similar, but not identical, to the framework for establishing wrongful discrimination.  A *prima facie* case of retaliation requires a plaintiff to show that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton*, 666 F.3d at 1357 (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)); *see also McGrath v. Clinton,* 666 F.3d 1377, 1380 (D.C. Cir. 2012) ("To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650-51 (D.C. Cir. 2003); *Singletary v. District of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003); *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984).  With respect to the first element, protected activity encompasses utilizing informal grievance procedures, such as complaining to management or human resources about the discriminatory conduct, as well as the filing of both informal and formal EEO complaints.  *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of

discrimination."); *Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

The second element of an adverse employment action is necessary to sustain a claim of retaliation, just as it is for discrimination claims.  In the retaliation context, however, an employment action that is "materially adverse" is defined as one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Ginger v. District of Columbia*, 527 F.3d 1340, 1346 (D.C. Cir. 2008).  Thus, retaliation "encompass[es] a broader sweep of actions" than wrongful discrimination, including "extend[ing] beyond workplace-related or employment-related retaliatory acts and harms."  *Bridgeforth v. Jewell*, No. 12-5015, 2013 U.S. App. LEXIS 13467, *5 n.* (D.C. Cir. July 2, 2013) (internal quotation marks and citations omitted).

Finally, the lessened motivating-factor causation standard that applies to wrongful discrimination claims does not apply to claims of unlawful retaliation under 42 U.S.C. § 2000e-3(a).  Instead, a Title VII retaliation claim requires "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tex. Southwestern Med. Ctr.*, 133 S. Ct. at 2528.  In other words, "traditional principles of but-for causation" apply and the plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id*. at 2533.

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims such that "[w]here, as here, the employer has proffered a legitimate, non-retaliatory reason for a challenged employment action, the central question is whether the employee produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *McGrath*, 666 F.3d at 1383 (internal quotation marks, citation, and brackets omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (observing that "these principles apply equally to retaliation claims").

## III.   DISCUSSION

The plaintiff alleges six discrete instances in which she was targeted for retaliation because of her prior EEO activities and, in all but one instance, for gender discrimination.  Pl.'s Opp'n at 1-2; Compl. ¶¶ 31, 35.  As previously noted, the plaintiff alleges that the following actions were taken against her in retaliation of her prior EEO activities and because of her gender: (1) non-selection "for several positions within GPO, including the Assistant Production Manager position;" (2) "given a downgraded 2007 performance evaluation;" (3) "denied an office;" (4) "denied training opportunities;" and (5) "stripped of her supervisory duties."  Compl. ¶¶ 31, 35.  In addition, the plaintiff alleges that (6) she was "given [a] downgraded . . . 2008 performance appraisal" in retaliation for her prior EEO activities.  Compl. ¶ 35.  The defendant has proffered legitimate non-discriminatory and non-retaliatory explanations for each of these alleged instances.  The Court will assess these explanations in tandem with the strength of the plaintiff's *prima facie* claims of gender discrimination and retaliation, in order to determine whether the plaintiff has produced sufficient evidence attacking the defendant's explanations for the allegedly wrongful actions to present a triable issue of fact warranting denial of the defendant's motion for summary judgment.

### A.    Non-Selection For Assistant Production Manager Position

The plaintiff alleges that "Mr. Crawford's decision not to hire [the plaintiff] for the [Assistant Production Manager] position was motivated by both retaliation and sex discrimination," since she was "just as much qualified" as the selected candidate.  Pl.'s Opp'n at 20; Pl.'s Dep., ECF No. 21-5, at 32.  The defendant does not dispute that the plaintiff's allegations regarding her non-selection make out *prima facie* discrimination and retaliation claims, but rather contends that the plaintiff "cannot establish that the legitimate, non-discriminatory reason for her non-selection was a pretext for discrimination."  Def.'s Mem. at 6.  The plaintiff counters that the defendant's proffered reason for non-selection, namely, that the selected candidate was the best qualified candidate, is pretext because the selecting official "misrepresented her qualifications."  Pl.'s Opp'n at 22.  To determine whether the plaintiff's challenge to the defendant's proffered reasons for the plaintiff's non-selection are sufficient to present a triable issue, the Court looks first at the comparative qualifications of the plaintiff and the selected candidate, and then evaluates the plaintiff's evidence that her qualifications were misrepresented by the selecting official, as well as her other arguments purportedly showing pretext.

### 1.    Comparative Qualifications

To give rise to an inference of retaliation, the plaintiff must be "substantially more qualified" than the successful candidate to perform the duties listed in the vacancy announcement, and the non-selected candidate must have a "stark superiority of credentials." *Porter v. Shah*, 606 F.3d 809, 815, 816 (D.C. Cir. 2010) (internal quotation marks and citations omitted); *see also Grosdidier*, 709 F.3d at 25 ("To prevail on a relative qualifications claim, [the plaintiff] must show that she is '*significantly* better qualified for the job than [the applicant]

ultimately chosen.'" (emphasis in original) (quoting *Adeyemi v. District of Columbia*, 525 F.3d

1222, 1227 (D.C. Cir. 2008)).  When the relative qualifications of the plaintiff and the selected

candidate are generally similar, courts must be careful about injecting themselves or a jury into

the hiring process, unless there is a viable showing of pretext.  *See Stewart*, 352 F.3d at 429

(courts are "not 'superpersonnel departments that reexamine[] an entity's business decisions.'"

(alteration in original) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

Thus, the difference in qualifications must be "great enough to be inherently indicative of

discrimination."  *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation

marks omitted).  "In a close case, a reasonable [fact-finder] would usually assume that the

employer is more capable of assessing the significance of small differences in the qualifications

of the candidates, or that the employer simply made a judgment call."  *Aka*, 156 F.3d at 1294.

This is not even a close case.

  The job posting for the Assistant Production Manager position described the major duties

as including managing "production activities within the various Production Department

divisions," such as "pre-press, press and post-press work," and serving "as the authoritative

source of advice on procedural and regulatory matters with respect to printing operations."

Def.'s Mot., Ex. 4, ECF No. 21-8.  To be eligible for consideration for the position, which is a

"PG-14 grade level, applicants must possess 52 weeks of specialized experience equivalent to the

PG-13 grade level."  *Id.*[14]  In addition, the candidates were rated based upon their "annual

---

[14] Mr. Crawford acknowledged that when the plaintiff was placed on the list as qualified to be a candidate for the
Assistant Production Manager position, he "questioned Human Capital as to how she could be considered as
meeting the overall qualifications [of possessing 52 weeks of specialized experience equivalent to the PG-13 grade
level] and was told it was because of her pay rate," which "she received . . . as a result of the settlement."  Crawford
Aff. ¶ 7.  The plaintiff construes "Mr. Crawford's opinion that Ms. Warner's salary is only a result of her EEO
settlement," as evidence of "his retaliatory view toward her," Pl.'s Opp'n at 21, but that is a far stretch.  Instead, Mr.
Crawford proceeded to consider the plaintiff for the position, placed her second in the ratings among three
candidates, and gave her equivalent or even higher scores on some ratings than the other candidates.  Even the

performance rating," five job elements for "Knowledge, Skills, and Abilities (KSAs) required for this position," "work experience[,]" and "years experience." *Id.*

Set against these standards, the selecting official, Mr. Crawford, gave both the selected candidate, Mr. Lewis, and the plaintiff the same rating on four out of the five job elements, with the plaintiff receiving a slightly lower score of "4.5" compared to Lewis's "5" on the single KSA element regarding "knowledge of current manufacturing and/or printing plant methodologies." *Compare* Def.'s Mot., Ex. 6 ("Ranking Factors" for Richard C. Lewis), ECF No. 21-8, at 8, *with* Ex. 7 ("Ranking Factors" for Kimberly Warner), ECF No. 21-8, at 9.  While the plaintiff's score of "5" was higher than Mr. Lewis's score of "4" for "annual performance rating," the plaintiff received a lower score for "work experience" (*i.e.*, the plaintiff's score of "3" compared to Mr. Lewis's score of "5") and for "years experience" (*i.e.*, the plaintiff's score of "1.1" compared to Mr. Lewis's score of "3.7").  In the final tally of "total points," the plaintiff's rating of 31.6 was lower than that of Mr. Lewis' 35.7.

According to the defendant, Mr. Crawford selected Mr. Lewis for the position because Mr. Lewis was the "best qualified" candidate as reflected not only by the lower score received by the plaintiff but also by the "contemporaneous ranking of the candidates based on their written submissions against the KSA (knowledge, skill, and abilities) elements for the position, as well as factoring in other information from the written submissions, including work experience, years of experience, and the rating received in the employee's most recent performance rating."  Def.'s Mem. at 5.  Indeed, it is undisputed that the selected candidate held more positions than the plaintiff across a broader array of units that would be subject to supervision by the Assistant Production Manager.  Specifically, at the time of the selection, the selected candidate had held

---

plaintiff admits that her current position in DPC is not PG-13 and, apparently, does not carry a "Pay Grade" rating. Pl.'s Dep., ECF No. 21-5, at 119.

four supervisory positions, including group chief, assistant foreperson, foreperson, and foreperson in charge, and had worked in two different GPO divisions, Plant Planning and Bindery.  Crawford Dep., ECF No. 21-6, at 151:2-22.  In comparison, the plaintiff had held only two supervisory positions, including Supervisory Graphic Processor Operator and Chief of DPC, and had worked only in the DPC, which was relocated to the Binding division in 2005.  Compl. ¶ 6.  Further, it is undisputed that the selected candidate had 37 years of experience in the "trade," including at GPO, whereas the plaintiff had 11 years of experience at the time they both applied for this position.  Crawford Dep., ECF No. 21-6, at 158.

The plaintiff here does not – and cannot – contend that she is significantly or even markedly more qualified than the selected candidate.  Nevertheless, the plaintiff targets the selecting official, John Crawford, as "one of the chief architects" of the discriminatory and retaliatory actions she claims, Pl.'s Opp'n at 17,[15] and challenges as pretext his evaluation of her qualifications, arguing that "Mr. Crawford [i]ntentionally [m]ischaracterized [the plaintiff's] [q]ualifications as [c]ompared to Mr. Lewis's."  Pl.'s Opp'n at 21.  In attacking the qualifications-based explanation proffered by the defendant for the nonselection, the plaintiff may seek to expose flaws in the explanation by showing, for example, "that the employer's explanation was fabricated after the fact, . . . misstates the candidates' qualifications," *Aka*, 156 F.3d at 1295, or was based on an error or inconsistency regarding an employee's performance or qualifications that is "too obvious to be unintentional," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996); *see also Czekalski v. Peters*, 475 F.3d 360, 367 (D.C. Cir. 2007); *Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999); *Farris v. Clinton*, 602 F. Supp. 2d 74, 89-90 (D.D.C. 2009).  The plaintiff has simply not presented sufficient evidence on this record,

---

[15] It is undisputed that at the time of the plaintiff's nonselection, Mr. Crawford was aware of the plaintiff's settlement of her prior EEO complaints.  *See* Crawford Aff. ¶ 11 ("I was aware of her prior EEO activity, . . . I had no input in the final deal."); Crawford Dep., ECF No. 21-6, at 332-34.

however, that the appraisal of the plaintiff's qualifications was flawed such that the qualifications-based explanation for her non-selection was pretextual.

As evidence of the intentional mischaracterization of her qualifications, the plaintiff relies largely on two parts of the record: first, the plaintiff cites the portion of Crawford's Affidavit, in which he states that he did not consider the plaintiff to "have knowledge in running the stated Congressional work through the production plant," Crawford Aff., ECF No. 21-4, ¶ 7; *see also* Pl.'s Opp'n at 23; and, second, two statements allegedly made by Mr. Crawford in 2006 and 2008, which the plaintiff argues "demonstrate that he had both retaliatory and discriminatory animus towards Ms. Warner." Pl.'s Opp'n at 23. These arguments, and others, simply do not withstand scrutiny or create a triable issue of fact regarding the legitimate reason based on comparative qualifications for the selection of Mr. Lewis over the plaintiff for the position of Assistant Production Manager.

### 2. The Plaintiff Has Not Shown That Her Qualifications Were Mischaracterized

The plaintiff's claim that the selecting official "intentionally misrepresent[ed] a key determining factor in the hiring process" by not crediting her "intimate[] familiar[ity] with congressional work," is asserted without any effort to show how this adversely and precisely affected her ratings. Pl.'s Opp'n at 23. If this alleged "misrepresentation" resulted in a downgrading of the plaintiff's score on the single KSA element regarding "knowledge of current manufacturing and/or printing plant methodologies," for which she received a slightly lower score than the selected candidate, the effect was negligible since this only brought her score down by a half point. *See* Crawford Dep., ECF No. 21-6, at 155-56, 164 (for this job element, the plaintiff "said things that she did, so I gave her the benefit of the doubt at a 4.5 . . . . I didn't think she deserved a five . . . . In fact, she embellished . . . she didn't know the full

manufacturing.  She'd never been exposed to that.").  In other words, even if the plaintiff were given full credit for all of the KSA elements, her overall score would still remain lower than that of the selected candidate.

Indeed, the plaintiff's lower Total Rating is not due to her ratings for the KSA job elements but because her ratings for "years experience" and "work experience" were a combined 4.6 points lower than that of the selected candidate.  The "years experience" rating is computed by giving the candidate "1-point for each 10 years" of relevant employment.  Def.'s Mot., Ex. 6, ECF No. 21-8.  The plaintiff does not appear to dispute that she was entitled to the "1.1" points for her 11 years of work at GPO's DPC unit and that the selected candidate was entitled to "3.7" points for his several decades of employment at GPO.  *See* Crawford Dep., ECF No. 21-6, at 158 (noting that the selected candidate received 3.7 points for his 37 years of experience).  For "work experience," Mr. Crawford gave the selected candidate the maximum score of "5" because he had worked his way "up through the ladder," as "a foreperson in charge . . . , as a group chief, assistant foreperson, foreperson" "in every unit in the binding division, which was many, plus in plant planning," and "had experience on all those different processes that go through the production department."  Crawford Dep., ECF No. 21-6, at 151-52.  By comparison, Mr. Crawford gave the plaintiff a score of "3" for her work experience because he "gave her the benefit of the doubt of being exposed in the Digital Print Center with pre-press."  *Id*. at 153-54.  There is no dispute that the plaintiff only gained relevant experience for the open position by working in the DPC, a single unit, in comparison to the selected candidate's experience across divisions and in multiple units that would be under the supervision of the Assistant Production

Manager.  Thus, the higher score for the selected candidate's "work experience" appears both reasonable and well-founded.[16]

With respect to specific work on the Congressional Record, Mr. Crawford testified that this work is "equivalent to putting out a newspaper every day, and it's what each representative and Senator says on the floor, and that's documented into the Congressional [R]ecord," and that to "the best of [his] knowledge" DPC did not print the Congressional Record, but only congressional bills and hearings with "small page numbers."  Crawford Dep., ECF No. 21-6, at 162-63, 165.  The plaintiff counters that DPC produces "the Congressional Bound Record, and other congressional work, including bills up to 140 pages that are being bound," and that DPC's production is "limited only by the number of copies required; jobs requiring a very large run are produced in the Press Division."  Pl.'s Opp'n, Ex. 9 (Declaration of Angela Jones) ("Jones Decl."), ECF No. 24-9, ¶ 26.  While Mr. Crawford may not have credited DPC with the full amount of congressional work that the plaintiff claims is performed by DPC, this difference in perspective simply does not create a genuine issue whether his reason for not selecting the plaintiff was pretextual, in the face of the clear breadth and depth of the other experience of the selected candidate by comparison to the plaintiff's background.  A minor mistake of fact on an issue that would not alter the outcome of a decision does not render an explanation pretextual.  As one circuit court has pointed out, "[p]retext is a lie, not merely a mistake."  *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000); *see also Price v. Thompson*, 380 F.3d 209, 214 n.1 (4th Cir. 2004) ("[M]ere mistakes of fact are not evidence of unlawful discrimination[.]").

---

[16] In any event, even if the plaintiff had been given the maximum score of 5 for "work experience," the addition of two points to her overall score would not have pushed her Total Rating higher than that of the selected candidate.

### 3. Two Alleged Remarks Do Not Show Any Discriminatory or Retaliatory Animus

The plaintiff cites two remarks allegedly made by Mr. Crawford in 2006 and in 2007, respectively, that she alleges "demonstrate that he had both retaliatory and discriminatory animus towards [the plaintiff]."  Pl.'s Opp'n at 23.  Although a supervisor's single egregious remark may constitute direct evidence of discrimination entitling a plaintiff to a jury trial, *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (supervisor's explicit statement that he "denied [plaintiff] a raise because of his race" is sufficient basis to deny summary judgment), "'[s]tray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff." *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) (quoting *Simms v. U.S. Gov't Prt'g Office*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000); s*ee also Sewell v. Chao*, 532 F. Supp. 2d 126, 138 n.8 (D.D.C. 2008) ("Evidence of discrimination does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself." (internal quotation marks and citation omitted)); *Aliotta v. Bair*, 614 F.3d 556, 570 & n. 6 (D.C. Cir. 2010) (even if plaintiffs in age discrimination suit showed that then-Deputy Chairman of FDIC made statement that he would like to "keep some of the youngest and brightest people who are moving up in the ranks," that "statement, [] is insufficient, on its own, to establish proof of discriminatory intent.").

In this case, the plaintiff first describes a conversation with Mr. Crawford in early 2006, in which she expressed concern that she "was being disrespected by [her] male supervisors because [she] was a woman." Pl. Decl. ¶ 12.  No other detail is provided by the plaintiff about the precise actions taken by her male supervisors that made her feel this way, nor does she indicate whether her complaint to Mr. Crawford was similarly vague.  In any event, in response,

Mr. Crawford allegedly told the plaintiff that "what [she] was experiencing was how it is for women at the plant. [Mr. Crawford] told [the plaintiff] that [she] would have to work extra hard and deal with it and that [the plaintiff] should 'suck it up.'"  Pl. Decl. ¶ 12; Jones Decl. ¶ 5; Pl.'s Dep., ECF No. 24-1, at 51.  According to the plaintiff, this statement shows Mr. Crawford's "discriminatory attitude toward women[.]"  Pl.'s Opp'n at 23.  Even if the plaintiff's rendition of the conversation is assumed to be true, the statement attributed to Mr. Crawford is insufficient to suggest pretext for the plaintiff's non-selection in March, 2008, at least two years later.  Not only is this statement too remote in time, and unrelated to the selection process for the Assistant Production Manager position, but the plaintiff's interpretation of the statement as discriminatory is not self-evident.  On the contrary, this statement could be interpreted as an effort to "buck-up" the plaintiff's spirits with advice on maintaining her focus on doing a good job, despite the way she felt about "being disrespected."  Moreover, the plaintiff's view that this 2006 remark reflects discriminatory or retaliatory animus, is difficult, if not impossible, to reconcile with the fact that Mr. Crawford was her supervisor in 2006 and responsible for giving her an "outstanding" performance evaluation for that year, which strongly undercuts the plaintiff's interpretation of this remark.  Pl.'s Dep., ECF No. 21-5, at 77.

The plaintiff also cites a remark allegedly made by Mr. Crawford in November 2007, approximately four months before the plaintiff's non-selection for the Assistant Production Manager position.  According to the plaintiff, she was told in a telephone call from Mr. Young, her former supervisor who was also a defendant named in her first and second EEO complaints, that at a management meeting, where the plaintiff was not present, Mr. Crawford stated that he was going to "let the dogs out" on the plaintiff.[17]  Pl.'s Dep., ECF No. 21-5, at 36-39.  Mr.

---

[17] The parties dispute whether Mr. Young's statement repeating the alleged statement by Mr. Crawford constitutes inadmissible hearsay.  *See* Def.'s Mem. at 8-9; Pl.'s Opp'n at 18-20.  Evidence will be disregarded at summary

Crawford "absolutely" denies ever making this statement and indicated that "I don't use terms like that.  I can't imagine anybody thinking something like that."  Crawford Dep., ECF No. 21-6, at 331.

This alleged remark does not help the plaintiff's effort to defeat summary judgment for at least two reasons.  First, to the extent that the plaintiff contends that this remark reflects discriminatory intent, nothing in the statement suggests that the plaintiff was being targeted based upon her gender.  For example, in *Forman v. Small*, the D.C. Circuit considered statements that were less ambiguous than those at issue here and held that the statements were not sufficient to create a triable issue when the defendant offered a legitimate, non-discriminatory reason for the challenged decision that the plaintiff failed to otherwise rebut as pretext.  *Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001) (in age discrimination suit, "series of comments . . . that implicitly referred to [the plaintiff's] age [including] . . . that [the plaintiff] may be 'over the hill' or in the 'twilight of his career,' and may have 'written his last significant article'" may support *prima facie* case but did not show pretext in legitimate reason given by employer for denying promotion); *see also Reshard v. LaHood*, No. 87-2794, 2010 U.S. Dist. LEXIS 34426, at *74-76

---

judgment only if it "cannot be presented in a form that would be admissible in evidence" at trial.  Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987); *Bergbauer v. Mabus*, No. 09-1032, 2013 U.S. Dist. LEXIS 43999, *9 n.4 (D.D.C. Mar. 27, 2013).  The alleged 2007 Crawford remark is, on its face, inadmissible hearsay within hearsay, consisting of the plaintiff repeating what Mr. Young allegedly told her about what Mr. Crawford allegedly said.  Certainly, the plaintiff could not testify as to what Mr. Young allegedly told her, nor could Mr. Young testify about what Mr. Crawford said, unless that statement falls under the opposing party statement exception to the hearsay rule, as the plaintiff contends, *see* Pl.'s Mem., ECF No. 24, at 19 (arguing that Mr. Young's "supervisory position is enough to render his statement a party admission"), or is offered for a non-hearsay purpose, such as state-of-mind.  *See* Fed. R. Evid. 801(d)(2), 803(3); *see also Whitbeck v. Vital Signs*, 159 F.3d 1369, 1374 (D.C. Cir. 1998).  Putting aside the admissibility issues, the fact that the plaintiff did not produce any sworn testimony from Mr. Young regarding this remark during extensive discovery in this case, or in opposition to the pending summary judgment motion, is an evidentiary deficiency that raises significant question about the reliability of this evidence from Mr. Young and underscores the significant issue of whether the plaintiff would be able to convert Mr. Crawford's alleged remark into admissible evidence for trial.  Nevertheless, despite these critical concerns, the Court will consider this remark given the possibility, however slight, that the plaintiff may be able to admit it, and, in any event, such consideration does not alter the outcome of this case.

(D.D.C. Apr. 7, 2010) (court found no evidence to support plaintiff's claim that supervisor's comment comparing her to white co-worker with lower pay grade "had racial implications" and "even if the Court could infer that [the supervisor]'s comment and the plaintiff's listing in the staff directory were racially motivated, these events would qualify as nothing more than 'trivial' harms and 'petty slight[s],' which would not support a claim of retaliation.").  While the remark attributed to Mr. Crawford was "upsetting" to the plaintiff, Pl. Decl., ECF No. 24-3, ¶ 16, she understood from Mr. Young that this remark meant that she had to "be careful and hold myself accountable and just make sure I'm doing what I [sic] supposed to do like I've always been doing."  Pl.'s Dep., ECF No. 21-5, at 49.  Thus, the plaintiff's own interpretation of this alleged remark is that, with his new promotion to a more senior management position, Mr. Crawford would insist that the plaintiff perform her job responsibilities at the highest level because she would be held "accountable."  This is a peculiarly weak basis for claiming gender discrimination.

Second, to the extent that the plaintiff contends that Mr. Crawford's alleged remark in November, 2007 reflects retaliatory animus, it is unclear for what protected activity the plaintiff claims it was in retaliation.  Her first and second consolidated EEO complaints were resolved by settlement in March, 2007, over eight months *before* the comment was made, so this protected activity was remote in time from the date of the alleged remark.  Such an extensive time gap between protected activity and purported retaliation has been found to be too attenuated to support an inference of retaliation.  As the D.C. Circuit concluded in a recent case involving a similar "gap between the protected activity and the alleged retaliation" of approximately eight months, "[o]nce the time between a protected disclosure and a negative employment action has stretched to two-thirds of a year, there is no 'temporal proximity' that supports a causal connection between the two, nothing else appearing . . . .  The fact that one event precedes

another does not in itself evidence causation." *Payne v. D.C. Gov't*, No. 11-7116, 2013 U.S.

App. LEXIS 11478, at *22-24 (D.C. Cir. June 7, 2013). Moreover, as the defendant points out,

the "[p]laintiff has offered no explanation as to why Mr. Crawford would be motivated to

retaliate against her based on that prior EEO activity, which was based on an EEO complaint that

pre-dated the reorganization that moved the DPC under the Bindery." Def.'s Mem., ECF No. 21,

at 9 (citing Ex. 9, at 1; Ex. 1, Pl.'s Dep., ECF No. 21-5, at 144; Ex. 2, Crawford Dep., ECF No.

21-6, at 331-33). Finally, at the time of the alleged remark, the plaintiff had not engaged in the

filing of her third, fourth or fifth informal or formal EEO complaints, which are at issue in the

instant lawsuit.[18] Thus, there can simply be no causal relationship between the alleged

November 2007 remark and the plaintiff's *subsequent* protected activity.

In short, the Court agrees with the defendant that this remark cannot defeat summary

judgment but "at most, [] shifts the burden to the Defendant to articulate a legitimate, non-

discriminatory reason for Plaintiff's non-selection, which Defendant has done." Def.'s Mem.,

ECF No. 21, at 10.

### 4.    Plaintiff's Other Arguments Do Not Show Pretext

The plaintiff offers two other arguments for rejection of the defendant's relative-

qualification reason for her non-selection. Neither of these arguments has merit, however. First,

the plaintiff cites "[s]tatistical evidence" purportedly showing that "GPO is systematically

discriminating against women," because the "upper echelons of management are

overwhelmingly male." Pl.'s Opp'n at 25; *see also* Compl. ¶ 10 ("The number of women in

senior supervisory positions is disproportionately low compared to their respective numbers in

GPO's overall white-collar workforce."). Specifically, the plaintiff points to evidence that while

---

[18] This protected activity was initiated when she filed her third informal EEO complaint on April 9, 2008. Compl. ¶ 23.

"[f]ifty-five percent of Printing Office Grade (PG) employees are female," as the pay scale

increases, "women are left behind: [o]nly 37% of PG-14 employees [(the pay grade of the

Assistant Production Manager position)] and 29% of PG-15 employees are women," and  "[o]nly

12% of the highest management positions . . . in the Senior Level Service, are held by women."

Pl.'s Opp'n at 3 (internal citation omitted).

Statistical evidence may be used to bolster a plaintiff's *prima facie* case of discrimination

or to show that the employer's stated reasons for the challenged actions are a pretext for

discrimination.  *See McDonnell Douglas*, 411 U.S. at 804-05; *Forman v. Small*, 271 F.3d at 292

("This circuit recognizes statistical data as relevant in individual discrimination claims.").

Nevertheless, since the ultimate issue in an individual's disparate treatment discrimination case

is "whether the particular plaintiff was the victim of an illegitimately motivated employment

decision," evidence of a statistical disparity is "ordinarily not dispositive."  *Krodel v. Young*, 748

F.2d 701, 710 (D.C. Cir. 1984); *see also Davis v. Joseph J. Magnolia, Inc*., 815 F. Supp. 2d 270,

280 (D.D.C. 2011) (finding statistical evidence "even less meaningful because it is not directly

relevant to the type of disparate treatment about which plaintiff complains"); *Simpson v. Leavitt*,

437 F. Supp. 2d 95, 104 (D.D.C. 2006) (concluding that statistical evidence of discrimination is

"not conclusive [in a disparate treatment case]"); *Horvath v. Thompson*, 329 F. Supp. 2d 1, 10

(D.D.C. 2004) (reasoning that "evidence that merely indicates an underrepresentation of [a

protected class] in the workforce does not itself establish pretext").  In order to be useful, the

plaintiff must focus the statistics on proving discrimination in her particular case.  *See Krodel*,

748 F.2d at 710.

The statistical evidence proffered by the plaintiff provides only a general description of

the gender make-up across all of GPO.  *Bolden v. Clinton*, 847 F. Supp. 2d 28, 35 (D.D.C. 2012)

("It is well-settled that mere description of the composition of a workforce, without more, does not support an inference of discrimination.") (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650 (1989); *Koger v. Reno*, 98 F.3d 631, 639 (D.C. Cir. 1996); *Whitener v. England*, No. 04-cv-0273, 2006 U.S. Dist. LEXIS 91436, at *7 (D.D.C. Dec. 19, 2006)).  The statistics do not show the gender composition, over time, of the persons who held the position of Assistant Production Manager, or even equivalent positions, in the Plant Operations division, nor do these statistics reveal the gender composition of the applicant pools available to fill the openings for those positions.  *See Bolden*, 847 F. Supp. 2d at 35 ("The plaintiff has not paired these facts with relevant comparisons of the applicants' relative qualifications.").  Absent more precision, the statistics cited by the plaintiff are insufficient to support an inference of discrimination or to show that the relative-qualifications reason given by the defendant for the plaintiff's non-selection is pretextual.

Second, in further support of her claims that her non-selection for the Assistant Production Manager position was discriminatory and retaliatory, the plaintiff points out that between 2005 and 2008, she has applied for seven jobs, and, "despite being ranked among the most qualified candidates for six of these, she was never selected; men were hired for all but two positions." Pl.'s Opp'n at 25; *see also* Compl. ¶ 31.  This is simply another form of statistical evidence on a personalized basis that fails to provide sufficiently precise information to be useful or persuasive.  The plaintiff provides no information other than the titles regarding the seven jobs for which she unsuccessfully applied, nor how her qualifications compared to the selected candidates.  Without some showing that the plaintiff was significantly more qualified than the selected candidates, her non-selection for other positions, no matter how many, is simply not

sufficient to support an inference of discrimination or to show pretext in her non-selection for the
Assistant Production Manager position.

***

The plaintiff has not provided sufficient evidence from which a reasonable jury could
find that her non-selection for the position of Assistant Production Manager was due to
discriminatory or retaliatory animus by Mr. Crawford.  On the contrary, the choice of Mr. Lewis
for this position is amply demonstrated on the record to be due to his longer employment history
with GPO, his broader experience in multiple divisions of GPO, and his specific work experience
in units for which the Assistant Production Manager is responsible.  Consequently, the defendant
is entitled to summary judgment on the plaintiff's claims predicated on her nonselection for this
position.

**B.      Q4 2007 and 2008 Performance Evaluations**

The plaintiff alleges that her Q4 2007 performance evaluation was downgraded due to
both gender discrimination and retaliation, and that her 2008 performance evaluation was
downgraded due to retaliation alone.  Compl. ¶¶ 31, 35.  As discussed below, the Court finds,
contrary to the defendant's contention, that the plaintiff's claims regarding the Q4 2007
evaluation are timely, but nevertheless concludes that the plaintiff has failed to present any
genuine dispute showing that the defendant's stated reasons for either of these performance
evaluations was pretextual.

**1.      The Plaintiff's Q4 2007 Performance Evaluation Claim Is Timely**

As a threshold issue, the Court must address the defendant's challenge to the timeliness
of the plaintiff's claim regarding her Q4 2007 performance evaluation.  The defendant contends
that the agency is entitled to summary judgment on this claim because the plaintiff "failed to

raise that claim with an EEO counselor within 45 days of her receipt of the rating."  Def.'s Mem. at 11-12.  In addressing this contention, the parties spill much ink about when the plaintiff "received" the Q4 2007 performance evaluation.[19]  She indisputably reviewed and signed the evaluation on January 7, 2008, and physically received a copy in March 2008.  *See* Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 27, at 14.  The plaintiff contacted an EEO counselor on April 9, 2008 to complain about this evaluation, s*ee* Compl. ¶ 23; Def.'s Facts ¶ 20, but the defendant contends this was longer than 45 days after January 7, 2008, when the plaintiff signed it.

The plaintiff counters that even if the personnel action is deemed to have occurred on January 7, 2008, the agency considered and issued a final agency action on the merits without raising timeliness concerns, thereby waiving any timeliness defense.  Pl.'s Opp'n at 16-17 (citing *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) ("[I]f [an agency] not only accept[s] and investigate[s] a complaint, but also decide[s] it on the merits--all without mentioning timeliness--[its] failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit."); *Johnson v. Billington*, 404 F. Supp. 2d 157, 162 (D.D.C. 2005) ("[W]hen a complaint has proceeded through administrative channels prior to arriving at the federal courthouse, and the agency has accepted, investigated and decided that complaint on its merits without raising the exhaustion issue, the exhaustion defense may be found to have been waived.")).  The defendant persists, however, arguing that the plaintiff's

---

[19] In support of the argument that the plaintiff's challenge to the Q4 2007 performance evaluation is untimely, the defendant claims that the plaintiff, on seeing her rating on January 7, 2008, "believed that her receipt of an 'excellent' rating instead of an 'outstanding' rating was the result of gender discrimination and retaliation."  Def.'s Facts ¶ 19.  The plaintiff, on the other hand, says that "[o]nly after Mr. Crawford refused to meet with her about the rating *and* she received her evaluation in March 2008 did [the plaintiff] conclude that she was not going to receive any further explanation and that her evaluation was not going to be changed."  Pl.'s Facts ¶ 19 (emphasis in original) (citing Pl. Decl. ¶¶ 31-32).  As discussed, *supra*, this is not a factual dispute with any bearing on the Court's conclusions.

claims regarding her 2007 performance evaluation "should be rejected because [she] misrepresented in the EEO process the date of her receipt of the rating and it was not until discovery in this litigation that [the p]laintiff conceded receiving the rating two months (January 2008) earlier than she previously had represented (March 2008)" and, as such, the agency had "no basis to assert that defense." Def.'s Reply at 13, 15. The defendant further contends that the plaintiff "[p]resented [the agency] with conflicting information as to when [she] actually received the evaluation she was challenging and as to when her claim may have accrued, [thus] the agency did not have a basis to find that the claim was untimely on the record before it."[20] Def.'s Resp. to Surreply, ECF No. 33, at 2 (comparing Pl.'s Surreply in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Surreply"), ECF No. 31, Ex. 1, GPO Report of Investigation of EEO Case Nos. 08-29 & 08-39 ("GPO Report"), at 5 ("Complainant states that in her performance evaluation she received in March 2008 . . . ."), with *id.* at 16 ("Complainant signed [her 2007 performance evaluation] on Jan. 7, 2008.")).

The agency conducted a full investigation and was well aware that the plaintiff signed the performance evaluation in January of 2008, yet it did not raise the issue of untimeliness. *See* GPO Report at 16. The plaintiff did, in fact, receive her own physical copy of the performance evaluation in March 2008, thus the statement made in her affidavit submitted to the EEO investigator was accurate, despite the defendant's contention to the contrary.[21] Moreover, the plaintiff has explained that she "sought out Mr. Crawford to learn the reasons behind her rating,

---

[20] The defendant also contends that the Court made it clear in *Bowden* that "its finding of waiver was not intended to 'create a sweeping principle concerning waiver of administrative time limits' but requires the court to engage in a 'balancing of equities' under the particular facts of each case." Def.'s Reply at 15 (citing *Bowden*, 106 F.3d at 439). For the reasons explained, the Court finds that equities here weigh in favor of the plaintiff.

[21] In her Affidavit for the EEO investigations, the plaintiff stated that, "[i]n March 2008 I received a performance evaluation where it was clearly visible that I had originally been given all 'outstanding' ratings but someone had erased the rating and lowered them to 'excellent.'" Def.'s Reply, Ex. 1, Affidavit of Kimberly Warner (Mar. 3, 2009) ("Warner EEO Aff.") ¶ 9.

reasons that might have borne on the existence of [her] claim by establishing a nonretaliatory and

nondiscriminatory rationale," Pl.'s Opp'n at 31 (internal quotation marks omitted) (alteration in

original), and that when Mr. Crawford never responded, she waited to contact the EEO until she

received a copy of the performance review in March 2008.  Under these circumstances, the Court

finds that the defendant waived any timeliness defense it may have had, and proceeds to consider

the merits of the plaintiff's discrimination and retaliation claims based upon her Q4 2007

performance evaluation.

### 2.    The Plaintiff Has Failed To Show Pretext For The Challenged Performance Evaluations

In order for a performance evaluation to constitute an adverse employment action

cognizable under Title VII, "it must affect the employee's 'position, grade level, salary, or

promotion opportunities.'"  *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (lowering of

evaluation from "Outstanding" to "Excellent" to "Fully Effective" over three year period was not

materially adverse in face of "bare, conclusory allegation that she was denied promotional and

bonus opportunities") (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008));

*see also Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) (an assessment did not affect

plaintiff's "position, grade level, salary, or promotion opportunities and was therefore not a

materially adverse action" (internal quotation marks and citation omitted)); *Taylor v. Small*, 350

F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance evaluations . . .

should not be considered [adverse actions] if they did not affect the employee's grade or salary."

(internal quotation marks and citation omitted)).  Evaluations may change over time due to a

variety of reasons, such as new demands of the job or different appraisal standards.  This is a

reality of the workplace and, consequently, a more negative evaluation compared to a prior

evaluation is simply not sufficient, standing alone, to establish discrimination, retaliation or

pretext.  Thus, here, the plaintiff cannot rely solely on her slightly lower performance evaluations of "excellent" rather than "outstanding" to support her claims.  *See, e.g., Reshard*, 2010 U.S. Dist. LEXIS 34426, at *71-74 (where plaintiff "received excellent evaluations," court did not "find that any material adversity resulted from the plaintiff not receiving the performance evaluations she contends she was entitled to receive [and] . . . plaintiff's performance evaluation allegations fail to support a claim for retaliation."); *Sutherland v. Mo. Dep't. of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009) (re-classification of plaintiff's performance from "highly successful" to "successful" with no reductions in pay, salary, benefits or prestige "does not provide a material alteration of [the plaintiff]'s employment and is not actionable"); *Holley v. N.C. Dep't. of Admin.*, 846 F. Supp. 2d 416, 444 (E.D.N.C. 2012) (performance ratings that varied between good, very good, and outstanding and an overall rating that remained at very good was found not to constitute a materially adverse action).

The plaintiff bolsters her claim, however, by arguing that her slightly lower performance rating of "excellent," rather than "outstanding," "reduced her bonus," and that a reduction of even a small amount in her bonus award is enough to show an adverse employment action.  Pl.'s Opp'n at 26.  The plaintiff did, in fact, receive substantial bonuses for Q4 2007 and in 2008 based upon her "excellent" performance evaluations.  Had she received the "outstanding" ratings she believed that she deserved, her bonus for Q4 2007 would have been increased by no more than fifteen percent, or in dollar terms, at most $217.50, and her bonus in 2008 would have been increased by between three and nine percent, or in dollar terms, between $129 and $345.  In view of the bonus payments and the relatively small amount of money the plaintiff alleges that she was denied, the defendant contends that her bonuses were not reduced "in any significant way . .

. to establish that these otherwise favorable ratings constitute adverse employment actions."
Def.'s Mem., ECF No. 21, at 11-12 n. 3 (citing Compl. ¶¶ 16-17).

Clearly, not every monetary harm that may occur in the workplace automatically
qualifies as an adverse employment action. *See Augustus v. Locke*, No. 09-1003, 2013 U.S. Dist.
LEXIS 46041, at *30 (D.D.C. Mar. 30, 2013) (loss of approximately $25 as a result of an
AWOL charge, was "a mere trivial harm, not an adverse employment action, and certainly not
the kind of action that requires action by this Court."); *Arafi v. Mandarin Oriental*, 867 F. Supp.
2d 66, 72 (D.D.C. 2012) (where plaintiff was not allowed to service two floors of hotel during
visit of Israeli delegation, the maximum amount of lost earnings was the amount of the tips
potentially earned from additional two floors and this "*de minimis* amount . . . cannot rise to the
level of an adverse employment action"); *Brooks v. Clinton*, 841 F. Supp. 2d 287, 301 (D.D.C.
2012) (failure to reimburse $70 taxi fare is not an adverse employment action); *Dorns v.
Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (denial of three hours of advanced sick leave
is too *de minimis* to be considered "material" or "significant" to constitute an adverse action);
*Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 76 n.4 (D.D.C. 2002) (concluding that the
difference between one day's pay and one day's overtime pay "could well be described as a *de
minimis* loss of pay, which does not rise to the level of adverse action").

The relatively small reduction in the plaintiff's bonuses due to the challenged
performance evaluations presents a close question as to whether she has established the requisite
adverse employment action for her *prima facie* discrimination case. The Court will grant this
issue to the plaintiff, however, for two reasons. First, in this Circuit, even seemingly small
reductions in bonus payments tied to performance evaluations have been found sufficient to
constitute an adverse employment action. *See Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir.

2001) (in reverse discrimination suit, plaintiff's receipt of bonus of $807 for an "excellent" performance rating, compared to her African-American co-worker's bonus of $1,355 for her "outstanding" rating, represented "the loss of a bonus that is worth hundreds of dollars [and] is not a petty detriment," warranting reversal of summary judgment because plaintiff "presented a prima facie case of reverse discrimination under Title VII based on an adverse employment action."); *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 29-30 (D.D.C. 2009) (where plaintiff received a 1 percent decrease in merit pay due to an "Achieves Expectations" rating rather than a higher "Excellent" rating, a decrease deemed "trivial" by defendant, court nonetheless found a "materially adverse action") (citing *Russell*, 257 F.3d at 818-19); *accord Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007) (lowered performance evaluation that resulted in the employee not receiving optional cash award, which she had regularly received in each of three years preceding protected activity, could be materially adverse action).

Second, since the defendant has proffered legitimate, non-discriminatory or non-retaliatory reasons for the actions, whether the plaintiff has established a *prima facie* case is "'a largely unnecessary sideshow[,]'" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (quoting *Brady v. Office of the Sergeant at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008)), and the Court's inquiry "distills to one question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [gender] . . . ?" *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  The Court now turns to this question. Nevertheless, in evaluating whether the plaintiff has produced sufficient evidence for a reasonable jury to find that the defendant's stated reasons are pretextual, the Court may consider,

among "the total circumstances of the case," *id.* (internal quotation marks and citation omitted),

the underlying strength of the plaintiff's *prima facie* case.

### i.        Q4 2007 Performance Evaluation

The plaintiff alleges that her Q4 2007 performance evaluation, which she received in

February or March, 2008, was downgraded because of her gender and in retaliation for her prior

EEO activities.  Compl. ¶¶ 16, 31, 35.  In support of this allegation, she points out that, timing-

wise, this was the first evaluation she had received following her settlement in March 2007 of

her first two EEO complaints, and that five of the nine Job Elements on the evaluation form

appear to have originally been checked as an "outstanding" rating, "but then someone had erased

those checkmarks and checked the box for a 'fully satisfied' rating."  Pl.'s Opp'n at 4; *see* Def.'s

Mem., Ex. 7-8 (GPO Employee Performance Ratings for Kimberly Warner), ECF No. 21-8;

Compl. ¶ 16.  Additionally, the plaintiff's overall rating was originally rated "outstanding, which

was then erased and then marked 'excellent,' a rating lower than 'outstanding.'"  Compl. ¶ 16;

*see* Def.'s Mem., Ex. 7-8 (GPO Employee Performance Ratings for Kimberly L. Warner), ECF

No. 21-8.  The defendant has proffered two reasons for the "excellent" rating on this

performance review: first, the "[p]laintiff's performance fell within the excellent not outstanding

range."  Def.'s Reply at 18.  Second, related to the first reason, the defendant proffered that since

this was the first rating period tied to performance goals with monetary bonuses, it became more

difficult to obtain the highest rating and, indeed, "no other supervisor in the Bindery received an

'outstanding' rating" on their Q4 2007 performance evaluation.  Def.'s Reply at 19; *see also*

Crawford Dep., ECF No. 21-6, at 58, 105 ("[S]tarting in 2008, we went to what we called

performance goals . . . the people at the top wanted to go with a new format and put, attach

bonuses to performance, and so the last quarter of the year, they did this.").

At the outset, the Court addresses the plaintiff's allegation that the ratings on the document reflecting the Q4 2007 evaluation appear to have been changed.  This fact, standing alone, does not indicate or suggest in any way that the changes in the check-marked boxes were due to discriminatory or retaliatory animus.  This performance review was done by Messrs. Allegar and Crawford, and Ms. Taylor's role was simply to hand the plaintiff the final review when it was available in February, 2008 from the Performance Review Committee.  Taylor Aff., ECF No. 21-2, ¶ 4; Crawford Aff., ECF No. 21-4, ¶ 5.  The plaintiff's fourth-level supervisor, Mr. Crawford, who reviewed this evaluation, explained that the rating supervisor is "supposed to" fill out the evaluation "in pencil because he or she can change their mind," and then, after concurrence by the reviewing supervisor, "finalize" it in ink before presenting the evaluation to the employee.  Crawford Dep., ECF No. 24-6, at 354-55; *see also id*. at 356 (the rating supervisor uses pencil "because the supervisor could rate them, re-think it, erase them, come back.  When they give the reviewer their final copy in pencil and the review says okay, I'm satisfied, then they mark them in ink, and then present them to the employee . . . . They write right over top of the check mark with ink.  That's how they do it.").  While Mr. Crawford did not make any changes on the challenged Q4 2007 Performance Evaluation, *see* Crawford Dep., ECF No. 24-6, at 98, and did not recall seeing any erasures on this document at the time of the review, *id*. at 353, he speculated that the high resolution copy used as an exhibit at the deposition "picked up" the erasure marks, *id*.[22]

The record simply does not support any nefarious reason for the changed ratings in the Q4 2007 Performance Evaluation, let alone why the erasures were made, other than that the rating supervisor changed some of his ratings before presenting them to Mr. Crawford.  In view of the undisputed fact that this was the first rating period connected to bonuses, it is plausible

---

[22] Neither party presented any sworn testimony from the rating supervisor, Mr. Allegar.

that changes were made to the evaluations to comport with the higher standards for obtaining the highest rating associated with a maximum bonus pay-out.  In fact, it is undisputed by the plaintiff that "Q4 2007 ratings of 'excellent' for other supervisors in the Bindery show[ ] similar erasure marks."  Def.'s Reply at 21.

The plaintiff challenges the defendant's first stated reason, however, stating that "GPO does not even generally defend the appropriateness of the ratings," on the Q4 2007 performance evaluation by contrast to its "detailed . . . defense . . . for the ratings in [the plaintiff]'s *2008* review."  Pl.'s Opp'n at 28 (emphasis in original).  The plaintiff is incorrect.  The defendant has explained that the challenged Q4 2007 rating of "excellent" was due to the plaintiff not meeting the metrics for certain goals.  Crawford Aff., ECF No. 21-4, ¶ 5 ("[T]he Production Manager [] did put goals about metric in Kim's rating that she had to meet . . . she had some metrics but they were not what the goal said.").  The plaintiff does not anywhere dispute that she did not meet all of the metrics for all of her goals, but instead attempts to deflect attention to the erasures, which, as noted above, do not show anything other than the author slightly revising his ratings, which is not enough to show pretext.

As to the defendant's second stated reason, that getting the highest rating of "outstanding" became more difficult in Q4 of 2007, the plaintiff has no response.  *See* Crawford Aff., ECF No. 21-4, ¶ 5 ("2007 was tied to money and the level for achieving 'outstanding' was a little more difficult because goals had to be met to get the money.").  Moreover, she does not dispute that, due to the more rigorous rating system applied, no supervisor in Bindery, including Mr. Crawford himself, received an "outstanding" rating for that period.  *Id*. (the plaintiff "received the same level of rating that [Mr. Crawford] did which afforded us a cash bonus . . . no one received an 'outstanding.'").  This fact significantly undercuts the plaintiff's *prima facie*

case of discrimination since she cannot demonstrate any disparate treatment.  *See Bridgeforth v. Jewell*, No. 12-5015, 2013 U.S. App. LEXIS 13467, at *10 (D.C. Cir. July 2, 2013) ("The context here [, where no other involved employee was nominated,] refutes [the plaintiff]'s claim that the failure to nominate him for a time-off award was an adverse action."); *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (inference of discrimination may be established "by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class").  On the contrary, she was treated exactly the same way and given the exact same performance rating as other "upper echelon" management in the Bindery Division. *See* Crawford Aff., ECF No. 21-4, ¶ 5 ("She did get a bonus in the Bindery so she was in the upper echelon.  Her race and sex and claim of reprisal were not factors in the rating she received.  As I stated, no one received an 'outstanding.'").

With respect to the plaintiff's claim that the Q4 2007 performance evaluation was retaliatory, the undisputed fact is that this evaluation was given to her in February, 2008, approximately ten months following her March, 2007 EEO settlement.  Def.'s Mem. at 13 ("Plaintiff cannot raise an inference of discrimination or retaliation in any event because . . . the rating was issued approximately 10 months after any prior protected conduct.").  The lack of temporal proximity between the evaluation and her protected activity makes any alleged causal connection between the two events highly implausible.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (for discrimination suits, "the temporal proximity must be very close": a three-or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all"); *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("[T]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.").

The plaintiff's claims of discrimination and retaliation based upon her Q4 2007 performance evaluation are further undercut by the relatively small amount of the reduction in her bonus attributable to her not receiving the "outstanding" rating that she says she deserved.  In short, the plaintiff has not presented sufficient evidence for any reasonable jury to find that the defendant's asserted non-discriminatory and non-retaliatory reason was not the actual reason and that the defendant intentionally discriminated against the plaintiff on the basis of her gender or issued the Q4 2007 evaluation to retaliate against her.

### ii.      2008 Performance Evaluation

The plaintiff alleges that her 2008 performance evaluation, which she received in February 2009, was downgraded to "exceeds expectation," the next to highest rating, rather than the highest rating of "outstanding," which she contends she deserved, in retaliation for her having filed EEO complaints on July 3, 2008 and August 21, 2008.  Compl. ¶¶ 17, 23, 25, 35.  In support of this allegation, the plaintiff contests the ratings she received for three out of six job elements on which her "exceeds expectations" evaluation was predicated.  Specifically, the plaintiff received a score of 67 points, which was three points fewer than required to obtain the highest overall "outstanding" rating, and, as a consequence, the amount of her bonus was reduced by between 3 and 9 percent.  Def.'s Mot., Ex. 12 (Summary Rating Form for period Oct. 1, 2007 through Sept. 30, 2008) ("Summary Rating Form"), ECF No. 21-8; Pl.'s Opp'n at 6; GPO Supervisory Performance Agreement.  In response, the defendant has proffered a legitimate, non-retaliatory reason for each of the three job elements for which the plaintiff received an "exceeds expectation" rating, based upon the testimony and declarations of the plaintiff's direct supervisor, Walter Wingo, who signed the performance evaluation on November 24, 2008, and the plaintiff's second-level supervisor, Katherine Taylor, who signed

the evaluation on November 26, 2008.  *See* Summary Rating Form.  Each of these three job

elements is discussed below.[23]

First, with respect to Goal 2, which governs "personnel management activities," *see* GPO

Supervisory Performance Agreement at 5, the defendant explained that the "[p]laintiff did not

receive an 'outstanding' rating . . . because she failed to 'ensure that 7B cards are up to date' and

that 'corrective actions are timely.'"  Def.'s Mem. at 14-15 (quoting GPO Supervisory

Performance Agreement).  The plaintiff does not dispute that the 7B card of a DPC Graphic

Processing Operator was not up to date, but claims instead that this was not her responsibility;

the plaintiff contends that her responsibility for ensuring that 7B cards were up to date extended

only to the 7B cards of her direct reports, not those of any other DPC personnel.  *See* Pl.'s Opp'n

at 6-7; Jones Decl. ¶ 25.  The plaintiff's purported subjective understanding of the limits of her

responsibility for this job metric are not borne out by the GPO Supervisory Performance

Agreement at 5, which states this requirement plainly as "Ensure 7B cards are up to date."  Thus,

the description of this job element for the Chief of DPC appears to be more consistent with the

measure applied by the plaintiff's supervisors.  In any event, even if the rating supervisors were

mistaken in their own understanding of this job element, this does not suggest that their mistake

renders their rating retaliatory, particularly when derived from the plain language of the goal in

question.  *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is

settled that 'it is the perception of the decision maker which is relevant, not the self-assessment

of the plaintiff.'" (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000))).

---

[23] The Summary Rating Form indicates that the plaintiff was scored at the maximum number of points possible for
her performance of Goals 1 (10 out of possible 10 points); 3 (10 out of possible 10 points); and 5 (15 out of possible
15 points), but scored at less than the maximum number of points possible for her performance of Goals 2 (8 out of
possible 10 points); 4 (12 out of possible 15 points); and 6 (12 out of possible 15 points).  *See* Summary Rating
Form.  The Goals themselves are outlined in a "Supervisory Performance Agreement," signed by the plaintiff on
March 24, 2008 and by Mr. Wingo and Ms. Taylor on March 25, 2008.  *See* GPO Supervisory Performance
Agreement.

Second, with respect to Goal 4, which relates to "[i]ncrease bindery profitability and timeliness of bindery revenue recognition," GPO Supervisory Performance Agreement at 7, the defendant explained that the "[p]laintiff did not receive an 'outstanding' rating . . . because she failed to '[d]evelop and maintain records by operator of percent time spent on printer operations and job handling; hand-fishing; Digipath utilization,' which was a requirement for the outstanding rating under her performance plan." Def.'s Mem. at 15 (quoting GPO Supervisory Performance Agreement). As her supervisor explained, the plaintiff "submitted log sheets with raw data, [while] [p]ercent is by definition a calculation, so I would expect to see a percent." Taylor Dep., ECF No. 21-7, at 54. The plaintiff does not dispute that she provided operator time in hours rather than in percentages, as required by the job element, but claims this format for reporting had been previously excused. Specifically, the plaintiff states that "although Ms. Taylor had not changed the language in Ms. Warner's performance plan, she had told Ms. Warner that reporting hours without a percentage was acceptable." Pl.'s Opp'n at 7; Pl.'s Dep., ECF No. 24-1, at 86-87; Taylor Dep., ECF No. 24-7, at 147; Pl. Decl. ¶ 38. Ms. Taylor confirms that she spoke to the plaintiff about this job element and advised her only that maintaining a log sheet was "okay . . . for data collection." Taylor Dep., ECF No. 21-7, at 55. Ms. Taylor denies having had any discussion with the plaintiff about whether that format would be okay for submission to show satisfaction of the goal since, "again, percent time is self-explanatory to me." *Id.*

To bolster her position, the plaintiff points out that Ms. Jones, a DPC supervisor, received an "outstanding" rating from Mr. Wingo for an identical goal, even though Ms. Jones submitted the same data as the plaintiff in operator hours rather than as a percentage of time worked. Jones

Decl., ECF No. 24-9, ¶ 24.[24]  According to the plaintiff, this differential treatment shows that the

reason for the reduction in rating given to the plaintiff for this job element is pretextual for

discriminatory and retaliatory animus.  Pl.'s Opp'n at 33.  The plaintiff overlooks one significant

factor in making this argument, however: namely, that Ms. Jones is supervised by the plaintiff,

who repeated to Ms. Jones what the plaintiff misunderstood from Ms. Taylor, "that the

information could be submitted in hours instead of percentages."  Jones Decl., ECF No. 24-9, ¶

24.  The fact that Ms. Jones followed her own supervisor's instruction is the same excuse that the

plaintiff uses to explain her lapse in complying with the explicit requirements of the performance

goal, but Ms. Jones did not misunderstand her supervisor's instruction and the plaintiff did.

Thus, as the defendant accurately points out, since the plaintiff "was the rating official for Ms.

Jones," her "decision to overlook that deficiency in one of her subordinates is not evidence that

[the plaintiff] was treated disparately by her superiors."  Def.'s Reply at 24.

    Finally, with respect to Goal 6, the defendant proffered that the "[p]laintiff did not

receive an 'outstanding' rating [on this goal] because she did not develop a job description

proposal by August 30, 2008 for a 'Graphic Processor Operator, Pre-flight Specialist,' as

required to receive an 'outstanding' rating for that element under her performance plan."  Def.'s

Mem. at 15.  The plaintiff disputes this assertion and claims that she included the written

standards and ratings for "Graphic Processor Operators" and a job description proposal for

"Graphic Processor Operator, Pre-flight Specialist" in the binder that she provided to Mr. Wingo

to show that she had met her Job Element.  Pl.'s Opp'n at 7-8; Pl. Decl. ¶ 39.  After the plaintiff

showed to Mr. Wingo the materials in the binder, he told the plaintiff that her rating would stay

---

[24] The defendant argues that evidence regarding Ms. Jones' performance evaluation should be ignored because the plaintiff "does not adequately substantiate her contention" by failing to include "with the opposition" "Ms. Jones' actual performance plan."  Def.'s Reply at 23-24.  In light of Ms. Jones' sworn declaration regarding both her performance goals and evaluation, however, the Court will consider the plaintiff's differential treatment contention.

the same because he had no way of knowing whether she had completed the documents by the

deadline.  Pl.'s Opp'n at 8.  The plaintiff does not dispute that she did not alert her supervisors

that the documents were completed, or physically turn over the requisite documents to her

supervisors, by August 30, 2008.  Moreover, she does not dispute that the documents offered by

the plaintiff to Mr. Wingo in support of her claim are undated.  Pl.'s Dep., ECF No. 24-1, at 92-

95.  Indeed, the plaintiff has provided no evidence, other than her assertions, to support her claim

that the documents were completed by the deadline of August 30, 2008, which was required to

obtain the "outstanding" rating for Goal 6 that she says she deserved.

In sum, the plaintiff has failed to produce sufficient evidence to create any triable fact

that would permit a reasonable jury to reject the defendant's proffered non-retaliatory reasons for

her "exceeds expectations" ratings for Goals 2, 4 and 6 in her 2008 Performance Evaluation or to

find that the employer intentionally retaliated against the plaintiff because of her prior EEO

activity.  Thus, this asserted basis for her retaliation claim cannot withstand the defendant's

summary judgment motion.

### C.    Plaintiff's Complaints About Her Working Conditions

The Court next turns to the plaintiff's assorted claims regarding her work conditions,

which she argues were imposed on her for discriminatory and retaliatory reasons.  Although the

claims in the Complaint identify only one working condition − that she "was also denied an

office," Compl. ¶¶ 31, 35 − the plaintiff also apparently considers understaffing at DPC, which is

mentioned in her factual allegations, *see id*. ¶ 21, as support for her claims.  Consequently, the

Court will consider both her lack of a private office and DPC understaffing in evaluating whether

the record contains a triable issue regarding these work conditions being imposed for

discriminatory and retaliatory reasons to refute the defendant's proffered explanations for their presence.

### 1. Plaintiff's Lack of Private Office

The plaintiff contends that she was "promised an office on several occasions but has never received one," Compl. ¶ 20, and, further, that she "faces unnecessary obstacles to performing [her] tasks because she does not have a private work space[,]" *id*. The plaintiff's deposition testimony and performance reviews contradict this contention. At the outset, it is worth noting that the plaintiff has not had a private office during her entire employment at DPC, so she cannot contend that this working condition has changed for the worse after she engaged in any protected activity. In addition, despite her expressed wish for a private office, she has been able to perform her duties and accomplish her performance goals successfully using the facilities provided to her. Indeed, the plaintiff testified that she was able to perform her job duties notwithstanding her lack of a private office. Pl.'s Dep., ECF No. 21-5, at 113-14. Not only has the plaintiff been able to perform her job duties, but she has been able to perform them successfully as evidenced by the "exceeds expectations" or "outstanding" ratings she has earned on her performance reviews over multiple years. Under these circumstances, the Court finds that the plaintiff's lack of a private office simply does not constitute an adverse employment action for her discrimination claim, nor is it materially adverse for purposes of her retaliation claim, even if the plaintiff finds this working condition inconvenient and aggravating.

In any event, the defendant has asserted a legitimate, non-discriminatory and non-retaliatory reason for not providing the plaintiff with a private office. Mr. Crawford has expressed his support for the plaintiff to have a new office, and explained that he had planned to construct a private office for the plaintiff within DPC, but others within GPO management

determined that new machinery had to be placed in the planned location for the plaintiff's new office.[25]  Crawford Aff. ¶¶ 9, 10; *see* Pl.'s Dep., ECF No. 21-5, at 114-16.  There is simply insufficient evidence to show that the real reason for the plaintiff's continued and long-standing lack of a private office was in retaliation for the plaintiff's prior EEO activities or motivated by discriminatory animus.

### 2.    DPC Understaffing

The plaintiff alleges that the lack of adequate staffing at DPC has resulted in the plaintiff and her staff "being overworked, unable to take time off, and under intense pressure."  Compl. ¶ 21.  She further alleges that she filled one vacancy for an Océ operator in 2007, but that "the job announcements for the other four positions were canceled."  *Id.*; *see also* Pl.'s Opp'n at 11 ("Both Mr. Crawford and Ms. Taylor have canceled DPC vacancies [in May 2008] without consulting [the plaintiff], even though [the plaintiff] was the selecting official and the DPC remained understaffed.").  This allegation does not withstand scrutiny in light of the undisputed evidence uncovered during discovery.

First, the fact that employees, especially U.S. government employees in a time of severe federal budget constraints, face overwork due to the elimination of vacant positions does not constitute a materially adverse employment action.  *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2011) (finding denial of additional resources and support is not sufficient to qualify as a material adverse action).  Moreover, the record indicates that the failure to fill all of the vacant positions was due, at least in part, to the actions of the plaintiff, who determined in 2007 and 2008 that she did not have a sufficient number of qualified candidates to fill the

---

[25] The defendant also contends that the plaintiff's claim is untimely, noting that she learned by February 2007 about the installation of new machinery in the planned space for her new office, and by January 2008 about another supervisor receiving an office after his promotion.  Her knowledge of both events fall "outside the 45-day period preceding her EEO complaint on April 9, 2008."  Def.'s Mem. at 21 (citing Pl.'s Dep., ECF No. 21-5, at 110-14).  The Court need not address this timeliness challenge because this issue is decided on other grounds.

positions.  Pl.'s Dep., ECF No. 21-5, at 203-07; Taylor Aff., ECF No. 21-2, ¶ 9.  In any event, the plaintiff did fill one vacancy in 2008, and was subsequently able to hire three graphic process operators in 2009-2010.  Compl. ¶ 21.

Second, the defendant has proffered a legitimate reason for the canceled positions that the plaintiff cannot and does not dispute.  Specifically, the defendant explains that "during the [Fiscal Year 2009] budget process that was occurring at that time and in which headcount was being reduced across the board, Ms. Taylor could not make a business case to keep those vacancies in the budget," especially in light of the length of time "the DPC was able to operate without those positions being filled."  Def.'s Mem. at 22 (citing Taylor Aff. ¶ 9).  No evidence has been presented that raises any triable fact about this assessment of the "business case to keep those vacancies," and, consequently, this allegation does not sustain the plaintiff's claims of discrimination or retaliation.

### D.    Denial of Professional Opportunities

Under the broad rubric of "[o]bstacles to [a]dvancement," the plaintiff includes factual allegations that she "has been denied valuable opportunities to cross-train – that is, to train to do work in another GPO division[,]" and "denied the opportunity to serve on special committees and projects" because of her gender and in retaliation for her prior EEO activities.  Compl. ¶ 15.[26]  These allegations do not defeat the defendant's motion for summary judgment because they do not amount to adverse employment actions and also present no triable fact to rebut the

---

[26] The defendant indicates that "to the extent [the plaintiff] complains that Mr. Crawford denied her request to cross-train while he was Superintendent of the Bindery, any such claim would have arisen no later than November 2007 when Mr. Crawford left that position to become Production Manager, and therefore is untimely because Plaintiff did not seek EEO counseling until April 9, 2008."  Def.'s Mem. at 27 (citing, e.g., *Hill v. Kempthorne*, 577 F. Supp. 2d 58, 64 (D.D.C. 2008)).  The Court need not address this timeliness challenge, however, because the plaintiff's challenge is decided on other grounds.

non-discriminatory, non-retaliatory reasons proffered by the defendant for the plaintiff's treatment.

First, the denial of training opportunities and committee assignments outside of, or in addition to, an employee's job responsibilities does not generally constitute an adverse employment action. *See Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (finding the denial of the plaintiff's request to attend four training courses did not rise to the level of adverse employment actions under Title VII); *Brooks v. Clinton*, 841 F. Supp. 2d 287, 301 (D.D.C. 2012). To "constitute an adverse employment action[,]" the plaintiff must "'tie the alleged discriminatory employment action to some actual, tangible adverse employment consequence.'" *Edwards v. EPA*, 456 F. Supp. 2d 72, 85 (D.D.C. 2006) (quoting *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 102 (D.D.C. 2005)). Thus, "to be adverse, the denial of a . . . training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment." *Id.* at 86.

Here, the plaintiff makes the conclusory assertion that cross-training and service on committees are the "types of experience [that] can be the determinative factor in [promotion] decisions." Compl. ¶ 15. She argues that "prevent[ing her] from acquiring experience and knowledge that she could note on her resume and use to apply to better jobs within GPO, negatively affect[ed] her future employment opportunities and future salary." Pl.'s Opp'n at 42. Such alleged harm is not "actual" or "tangible." It is speculative. Indeed, close examination of the plaintiff's non-selection for the Assistant Production Manager position shows that the selecting official's focus was on the actual jobs held by the candidates, rather than committees on which they served or cross-training they received. Thus, the claimed denial of opportunities to cross-train or serve on committees is not a materially adverse employment action.

Second, even if these claimed denials of opportunity did qualify as adverse employment actions, for each incidence cited by the plaintiff, the defendant has asserted legitimate, non-discriminatory and non-retaliatory reasons.  With respect to the plaintiff's alleged requests to cross-train, the plaintiff concedes that "no formal cross-training program exists" to which she was denied consideration.  Pl.'s Opp'n at 43.  Furthermore, the plaintiff can cite to no other person similarly situated to the plaintiff, or from DPC generally, who was cross-trained in other divisions of the Bindery.  The fact that the plaintiff is not a journeyman and never completed a bookbinding apprenticeship is a significant barrier to her being eligible for cross-training in another Bindery unit, where employees have this specialized training.  In fact, the plaintiff conceded that she has not pursued this specialized training.  Pl.'s Dep., ECF No. 21-5, at 18-23. The plaintiff bases her allegation about being denied cross-training on the example of Darrell Mahoney, "a Foreperson in the Bindery Division."  Compl. ¶ 15.  The plaintiff's belief that Mr. Mahoney was sent to DPC for "cross-training" is based upon her impression that Mr. Mahoney "seemed to be checking on the work that [plaintiff] was doing and interacting with her subordinates when she was not present in the DPC."  Pl.'s Opp'n at 43.  Yet, Ms. Taylor made clear that Mr. Mahoney was sent to DPC to assist the plaintiff with the administrative functions of a DPC training program, in 2008, during the same time period the plaintiff complains that she and the DPC staff were overworked and understaffed.  Taylor Aff. at ¶¶ 10-13; Taylor Dep., ECF No. 24-7, at 137-38.  The plaintiff's impression is insufficient to convert Mr. Mahoney's task into a cross-training opportunity and leaves no triable fact regarding her supervisor's reason for sending Mr. Mahoney to DPC.[27]

---

[27] In addition, given that Mr. Mahoney had a different title, job and training than the plaintiff, it is entirely unclear whether Mr. Mahoney is a similarly situated employee to her.  *See Nueren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

The plaintiff has identified one instance in 2010 where her request to serve on the Safety Committee was denied.  Pl.'s Dep., ECF No. 21-5, at 152-54.  The only supervisor on this Committee had been named by Ms. Taylor at the suggestion of the safety office, and the other members of the Committee were intentionally non-supervisory employees in order to give them the opportunity to assess the safety of their own work areas.  Taylor Dep., ECF No. 21-7, at 152-57.[28]  The plaintiff does not dispute that there is only one supervisor on the Safety Committee or that the choice of the single supervisor assigned was due to the recommendation of the safety office.  Thus, she has not produced sufficient evidence for a reasonable jury to find that the defendant's asserted non-discriminatory, non-retaliatory reason was not the actual reason and that the defendant intentionally discriminated or retaliated against the plaintiff by denying her request to serve on the Safety Committee.

### E.    Changes In Plaintiff's Supervisory Duties

The plaintiff alleges that GPO management "made two personnel decisions concerning the DPC that undermined [her] advancement opportunities by reducing her supervisory duties" because of her gender and in retaliation of her prior EEO activities.  Pl.'s Opp'n at 9; Pl. Decl. ¶ 54.  These two personnel decisions involve, first, the reassignment in July 2008 of two DPC employees from the GPO facility in Laurel, Maryland to the main GPO building, *see* Pl.'s Opp'n at 10, Def.'s Facts ¶ 36; and, second, the August 2008 detail to the U.S. Senate of a DPC employee, Mr. Middlebrooks, through another GPO unit, Congressional Publishing Services (CPS).  Compl. ¶ 26, Def.'s Facts ¶¶ 46-49.[29]  These personnel changes do not provide sufficient

---

[28] The defendant challenges the plaintiff's use of the Safety Committee to support her claims because "she did not exhaust this claim in the EEO administrative process underlying this action" and this claim "is not reasonably related to the exhausted claims."  Def.'s Mem. at 20.  The Court need not address this argument since the issue of the plaintiff's alleged denial of service on the Safety Committee is resolved on other grounds.

[29] Related to these personnel changes, the plaintiff also alleges that she was "left out of meetings where important decisions are made" because of her gender and in retaliation for her prior EEO activities.  Compl. ¶ 22.  Even if she

support for the plaintiff's claims since they do not constitute adverse employment actions and, even if they did, the plaintiff has not shown any triable fact regarding the defendant's legitimate, non-discriminatory and non-retaliatory explanations for the challenged actions.

While changes in job responsibilities may constitute adverse employment actions when they affect "the terms, conditions, or privileges of [the plaintiff's] employment or future employment such that a trier of fact could find objectively tangible harm," *Doe v. Gates*, 828 F. Supp. 2d 266, 270 (D.D.C. 2011) (emphasis omitted), the plaintiff fails to show how the two challenged personnel reassignments contributed to the stripping of the plaintiff's supervisory duties. The two DPC employees reassigned from the Laurel facility remain under the plaintiff's supervision and, thus, this reassignment did not result in a significant reduction in the "quantity or quality" of her supervisory responsibilities. Def.'s Facts ¶ 38 ("The operators reassigned from Laurel remained under [the plaintiff's] supervision after they were reassigned to main GPO."); Pl.'s Facts ¶ 38 ("Undisputed."); Taylor Aff., ECF No. 21-2, ¶ 8 ("The two people we brought back are still under her supervision."); *cf. Holcomb v. Powell*, 433 F.3d 889, 902-03 (finding the plaintiff "experience[d] an extraordinary reduction in responsibilities that persisted for years, from which a reasonable jury could conclude [the plaintiff] suffered objectively tangible harm," when "[t]he record include[d] uncontroverted testimony that her duties dramatically declined in both quantity and quality" (internal quotation marks omitted)). Moreover, the plaintiff has

---

did not attend all of the meetings related to the challenged personnel decisions, the plaintiff admits she was involved in the decision making process. *See* Pl.'s Dep., ECF No. 21-5, at 132-40. The plaintiff also contends she was excluded from meetings with vendors, *id.* at 139-40, but she has neither provided details of the meetings to evaluate their significance nor demonstrated how the exclusions interfered with her job performance. Under these circumstances, this allegation about exclusion from meetings simply does not rise to the level of an adverse employment action. *See Hayslett v. Perry*, 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (finding allegations of exclusion from job related meetings did not rise to an adverse employment action when the plaintiff neither specified meetings nor demonstrated how the exclusion caused her any harm); *cf. Allen*, 774 F. Supp. 2d at 199-200 (finding exclusion from fourteen meetings was an adverse employment action when the plaintiff described the alleged purpose of each meeting in detail and claimed that she was deprived of information critical to her duties and thus that her exclusion interfered with her job performance).

admitted that she maintains some supervisory responsibility for Mr. Middlebrooks, including

"[providing] technical support and . . . supplying a replacement when he was on leave."  Pl.'s

Opp'n at 40 (citing Pl. Decl. ¶ 56; Jones Decl. ¶ 14).  Even if the plaintiff's supervisory duties

for Mr. Middlebrooks were somewhat diminished, this does not rise to the level of an adverse

employment action.  Thus, these personnel changes do not satisfy the requisite elements for a

*prima facie* case of either discrimination or retaliation.

In any event, the defendant explains that both of the challenged personnel decisions were

"business decisions taken by GPO in response to budgetary pressures and other business

considerations."  Def.'s Mem. at 17.  Specifically, the two DPC employees in the Laurel facility

were reassigned "because it was not efficient to have those operators working out of Laurel when

similar machinery in the main building was available for them to use."  *Id*. at 23; *see* Taylor Aff.,

ECF No. 21-2, ¶ 8.  The Océ digital press operated by these employees requires two employees

to be present for safety reasons, and "if one did not show up, the other just sat there."  Taylor

Aff., ECF No. 21-2, ¶ 8.  In addition, with only two operators in Laurel, there was only one shift

"and nobody there on afternoon or night shift."  *Id*.  Since the GPO was "not getting additional

production . . . for business reasons we decided to shut it down at least temporarily."  *Id*.  The

plaintiff does not dispute the safety concerns with fewer than one operator, nor the single shift of

operators at the Laurel facility, but rather contends that some work at the main building gets

delayed since the Océ digital press there is now in operation so much.  Pl. Decl., ECF No. 24-3, ¶

55; Jones Decl., ECF No. 24-9, ¶ 12.  In short, the plaintiff does not dispute the reason for the

reassignment of the two DPC employees from the Laurel facility, but only the wisdom of that

decision.  Second-guessing the wisdom of a supervisor's decision, however, does not make that decision discriminatory or retaliatory.[30]

Regarding the change in the detail of Mr. Middlebrooks, the record is clear that the plaintiff's supervisor, Ms. Taylor, sought to effectuate the plaintiff's proposal of having this employee detailed to the U.S. Senate from DPC.  Given the significant financial loss to GPO without a detail for this employee, the plaintiff does not dispute that he needed to be detailed from some part of GPO.  Every other employee detailed from GPO to a congressional office is apparently detailed from CPS, and CPS insisted that no exception be made for Mr. Middlebrooks.  Taylor Aff. ¶ 7 ("All congressional details are managed from a single point in GPO, Congressional Publishing Services[.]").  Thus, over the objection of the plaintiff, "Ms. Taylor concurred with her management that she would do the best thing for GPO overall, which was to detail [Mr. Middlebrooks] through CPS rather than continue running at a loss."  Def.'s Mem. at 25 (citing Taylor Aff. ¶ 7).  The fact that the plaintiff "just did not like the outcome," Taylor Aff. ¶ 7, does not make the decision discriminatory or retaliatory.  Thus, the plaintiff has not provided evidence sufficient for a reasonable jury to find that the defendant's personnel reassignment decisions were pretext for discrimination or retaliation.

## IV.  CONCLUSION

The plaintiff's myriad complaints about her non-selection for another position, her performance evaluations for the fourth quarter of 2007 and 2008 (despite her substantial bonuses for those time periods), her working conditions, and management decisions regarding cross-

---

[30] Similarly, the plaintiff challenges the management decision to allow the lease for a DPC electric static color tone printer, called the iGen3, to expire in 2010, despite the fact that DPC had "steady work for the iGen."  Pl.'s Dep., ECF No. 21-5, at 131.  According to Ms. Taylor, this lease was allowed to expire because it was not cost effective to extend the lease based on an analysis of the amount of product generated off of the machine.  Taylor Dep., ECF No. 21-7, at 203-04.  The plaintiff admits that she was involved in discussions over whether to extend the lease.  Pl.'s Dep., ECF No. 21-5, at 130.  Even if the expiration of the lease for the iGen3 were construed somehow to be an adverse employment action, the plaintiff does not refute as pretext the legitimate, non-discriminatory reason for this business decision.

training, committee assignments, personnel reassignments, and equipment leases, paint a picture

of an employee who has been deeply dissatisfied, frustrated and unhappy in her job for years.  As

the D.C. Circuit has recently reiterated, "not everything that makes an employee unhappy is an

actionable adverse action," because otherwise the courts would be called upon to mediate "even

trivial employment actions that an irritable, chip-on-the-shoulder employee did not like."

*Bridgeforth v. Jewell*, No. 12-5015, 2013 U.S. App. LEXIS 13467, *4 (D.C. Cir. July 2, 2013)

(internal quotation marks and citations omitted).  Close examination of each of the plaintiff's

factual allegations underlying her claims of gender discrimination and retaliation, to the extent

these allegations constitute adverse employment actions, fail to raise any triable issue about

whether the defendant's proffered explanations for the actions taken were pretextual.  For this

reason, the defendant's motion for summary judgment as to each of the plaintiff's claims is

granted.

     An Order accompanies this Memorandum Opinion.

     Date: July 25, 2013

                  /s/ *Beryl A. Howell*
                  BERYL A. HOWELL
                  United States District Judge